KIMBERLEY FAYE GANGWISH, APPELLANT AND
CROSS-APPELLEE, V. PAUL ALLAN GANGWISH,
APPELLEE AND CROSS-APPELLANT.
678 N.W.2d 503

Filed April 29, 2004. No. S-02-274.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

Heather Swanson-Murray, of Yeagley Law Offices, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

Kimberley Faye Gangwish appeals from the decree dissolving her marriage to Paul Allan Gangwish, and Paul cross-appeals. At issue in this appeal are the trial court's decisions with respect to the property division, the child support determination, and an attorney fees award.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On November 5, 1988, Kimberley and Paul were married in Hastings, Nebraska. In the following years, three children were born to the marriage, currently ages 8, 11, and 13. Prior to their marriage, Paul worked for Gangwish Seed Farms, Inc., a family corporation, which had been founded by his father. In 1994, Paul stopped working for Gangwish Seed Farms and began to pursue

his own farming operation. To do so, Paul and Kimberley formed P.G. Farms, Inc., of which they are the sole and equal shareholders. Essentially, P.G. Farms is the corporate body through which Paul conducts his farming operation. Paul is considered an employee of P.G. Farms.

Prior to, and throughout the marriage, Kimberley has worked as a physician's assistant. During the marriage, however, Kimberley's employment arrangement changed and she became an independent contractor. In an effort to reduce Kimberley's tax liability, Paul and Kimberley formed K.F.G., Inc. Thereafter, whenever Kimberley would receive a paycheck, she would deposit the check into K.F.G.'s corporate account. Currently, Kimberley works nearly full time, earning $40 per hour.

On May 30, 2000, Kimberley filed a petition to dissolve the marriage, seeking custody of the children, child support, exclusive use of the family residence, and equitable division of the property. Finding the parties' marriage to be irretrievably broken, the trial court ordered the marriage to be dissolved. In addition, the court granted custody of the children to Kimberley, subject to reasonable visitation by Paul, and ordered Paul to pay child support in the amount of $1,567 per month. Paul was also ordered to maintain health insurance on the children, pay 66 percent of daycare expenses, and pay 66 percent of any unreimbursed medical, dental, optical, and orthodontia expenses.

As to the distribution of the parties' property, Kimberley was awarded, inter alia, (1) household furnishings and equipment, (2) two accounts at First State Bank of Shelton, (3) her retirement plans, (4) 14 shares of Gangwish Seed Farms; and (5) all shares of stock in K.F.G. Paul, on the other hand, was awarded, inter alia, (1) household furnishings and equipment; (2) two accounts at First State Bank of Shelton; (3) all shares of stock in P.G. Farms; (4) all shares of stock in Gangwish Seed Farms, minus the 14 shares awarded to Kimberley; (5) all shares of stock in another corporation, Platteland, Inc.; and (6) 320 acres of real estate in Buffalo County. To equalize the property settlement, the court ordered Paul to (1) pay a number of debts owed by the parties and their corporations, and to hold Kimberley harmless on the same, and (2) pay Kimberley $471,871.50. Paul was also ordered to pay $10,000 of Kimberley's legal fees.

On January 16, 2000, Kimberley moved for a new trial. In her motion for new trial, Kimberley alleged, inter alia, that (1) the court erred in its division of assets and debts, (2) the decision to grant the family home to Paul was contrary to the best interests of the children, (3) the court erred in its asset evaluation, and (4) the award of child support was not in accord with the Nebraska Child Support Guidelines. After a hearing, Kimberley's motion was denied. Thereafter, Kimberley filed a timely notice of appeal, and Paul cross-appealed.

### III. ASSIGNMENTS OF ERROR

Kimberley assigns, restated, that the trial court erred in (1) failing to award Kimberley the family home, (2) failing to add to Paul's income the depreciation expenses taken by P.G. Farms for purposes of determining child support, and (3) not deviating upward from the child support guidelines.

In his cross-appeal, Paul assigns, renumbered and restated, that the trial court erred in (1) failing to adequately account for the student loans Kimberley brought into the marriage; (2) failing to give Paul a credit for the personal, premarital funds he used to make a downpayment on the parties' first home; (3) awarding shares of Gangwish Seed Farms stock to Kimberley; (4) calculating Paul's child support obligation; and (5) awarding attorney fees to Kimberley.

### IV. STANDARD OF REVIEW

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Olson v. Sherrerd,* 266 Neb. 207, 663 N.W.2d 617 (2003).

■ In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge; this standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Longo v. Longo,* 266 Neb. 171, 663 N.W.2d 604 (2003).

■ The standard of review of an appellate court in child support cases is de novo on the record, and the decision of the trial court will be affirmed in the absence of an abuse of discretion. *Claborn v. Claborn, ante* p. 201, 673 N.W.2d 533 (2004).

## V. ANALYSIS

The parties' assignments of error fall into three categories: property division, child support, and award of attorney fees to Kimberley.

### 1. PROPERTY DIVISION

#### (a) The Marital Residence

During oral argument, Kimberley withdrew her first assignment of error relating to the trial court's award of the family home to Paul. Therefore, we will not discuss this previously assigned error.

#### (b) Kimberley's Student Loans

At the time of the parties' marriage, Kimberley owed $12,399.43 in student loans. During the marriage, Kimberley's loans were paid off with marital funds. However, in its decree, the trial court accounted for only $7,000 of the $12,399.43 debt that Kimberley brought into the marriage. Paul argues the court erred by failing to deduct the remaining $5,399.43 from Kimberley's award.

■ We agree that Kimberley's award should have been reduced by the total student loan debt that she brought into the marriage because that debt was paid off with marital assets. However, we do not believe this mistake constitutes an abuse of judicial discretion when it is placed in the context of the property division as a whole. In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge; this standard of review applies to the trial court's determinations regarding the division of property. *Longo, supra.* A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Nelson v. Nelson, ante* p. 362, 674 N.W.2d 473 (2004).

Here, the marital estate totaled well over $1 million and the alleged mistake constitutes less than one-half of 1 percent of this

total. Under these circumstances, we cannot say the court's error deprived Paul of a substantial right or a just result.

### (c) Paul's Premarital Funds

Shortly before their marriage, in 1988, the parties purchased a home in Grand Island, Nebraska. At trial, Paul testified that he paid $10,619.93 in personal, premarital funds for the downpayment on the home. He also presented evidence, in the form of check stubs from a check register, of his $10,619.93 contribution. The warranty deed for the house lists both Paul and Kimberley as grantees. After the parties were married, they purchased a new home and moved to Shelton, Nebraska. Thereafter, they found a buyer for their home in Grand Island and applied the proceeds from that sale to the payments on their new home.

In 1998, the parties decided to build their current residence at the site of P.G. Farms' farming operation in rural Buffalo County. To do so, they sold their residence in Shelton and loaned the proceeds from that sale to P.G. Farms, from which P.G. Farms paid for the construction of their new, and current, residence. On appeal, Paul argues that the court erred by not giving him a credit for the $10,619.93 in personal, premarital funds that he expended for the downpayment on the parties' first home in Grand Island.

 The purpose of a property division is to distribute the marital assets equitably between the parties. Neb. Rev. Stat. § 42-365 (Reissue 1998); *Claborn v. Claborn, ante* p. 201, 673 N.W.2d 533 (2004). Under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Mathews v. Mathews, ante* p. 604, 676 N.W.2d 42 (2004). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Tyma v. Tyma,* 263 Neb. 873, 644 N.W.2d 139 (2002).

On a number of occasions, we have examined similar factual circumstances. For example, in *Heald v. Heald,* 259 Neb. 604, 611 N.W.2d 598 (2000), we modified a property settlement to

credit the husband for making the downpayment on the parties' first marital home. In doing so, we recognized that when the husband made the downpayment, he used separate funds and was not yet married. *Id.* Therefore, because property which a party brings into the marriage is generally excluded from the marital estate, we determined that the husband was entitled to a credit for the downpayment he made on what became the parties' marital home. *Id.* Similarly, in *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001), we determined that a husband who owned the parties' residence prior to the parties' marriage was entitled to receive a credit for the amount of equity in the house at the time of the parties' marriage. See, also, *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003) (husband entitled to credit for downpayment he made on his business, when downpayment was made with separate funds, prior to his marriage).

We note that in neither case did the husband and wife have joint title to the subject property prior to their marriage. However, we conclude that this is a distinction without a difference. In *Schuman, supra,* the husband inherited a sizeable amount of money from his mother during his marriage. After receiving the money, the husband took part of it and applied it toward the downpayment on an acreage that he and his wife took in joint title. During the dissolution action, the husband, claiming the deposit was paid for with separate property, sought a credit for the amount of money he expended on the downpayment. *Id.* The district court determined that the inherited money he used for the downpayment became marital property when the acreage was placed in joint tenancy with his wife and refused to give him a credit. *Id.* We reversed, concluding that the manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage. *Id.* Because the husband proved that $19,000 of the $20,000 downpayment for the acreage came from his separate funds, i.e., his inheritance, we determined he was entitled to a credit in that amount. *Id.*

Similarly, in the instant case, the fact that the parties' home was jointly titled does not alter the fact that Paul provided documentary evidence to establish that he contributed $10,619.93 of personal funds toward its purchase prior to the parties' marriage.

Under these circumstances, Paul proved that he made a sizeable contribution to what became a joint asset from his personal funds, and normally, he would be entitled to a credit in that amount. See *Heald, supra* (property which party brings into marriage is generally excluded from marital estate). To rule otherwise would be to presume that Paul's expenditure of personal, premarital funds was, in essence, a gift of $10,619.93 to Kimberley. This we will not do. See *Schuman, supra* (disapproving *Gerard-Ley v. Ley*, 5 Neb. App. 229, 558 N.W.2d 63 (1996)).

■ Nonetheless, Paul is not entitled to a credit for the personal, premarital funds he expended on the parties' first home. The burden of proof to show that property is nonmarital remains with the person making the claim. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000). At trial, Paul testified that the proceeds from the sale of the parties' first home were used to make payments on their second home. Paul also testified that the parties loaned the proceeds from the sale of their second home, as well as some personal funds, to P.G. Farms and that P.G. Farms paid for the construction of their current residence. Essentially, Paul claims that when the parties sold their first home, his separate, premarital contribution was used, along with the remaining proceeds from the sale, to make the payments on the parties' second home. When the parties sold their second home, Paul claims his separate, premarital contribution was loaned, along with the remaining proceeds from the sale, to P.G. Farms.

Paul, however, did not present evidence that his premarital contribution retained its status as separate property after the parties sold their first home. More significantly, even if we were to assume Paul could trace his personal, premarital interest from the parties' first home to their second, Paul presented no evidence to document how his separate interest in the proceeds from the second home were in fact loaned to P.G. Farms. In fact, outside of Paul's testimony, the record is devoid of evidence which establishes that *any* of the proceeds from the sale of the parties' second home were in fact loaned to P.G. Farms. In the absence of such evidence, we cannot say that the trial court abused its discretion by not giving Paul a credit for his premarital contribution toward the downpayment on the parties' first home. See *Rezac v. Rezac*, 221 Neb. 516, 378 N.W.2d 196 (1985) (noting problems

with tracing premarital property through disposition and reinvestment during marriage).

### (d) Gift of Stock

During the parties' marriage, Leland Gangwish, Paul's father, gifted shares of Gangwish Seed Farms stock to both Paul and Kimberley. On December 29, 1994, Paul and Kimberley each received a certificate for eight shares of Gangwish Seed Farms stock. On August 23, 1996, Kimberley transferred her eight shares to Paul. On December 30, 1996, Paul and Kimberley each received a certificate for six shares of Gangwish Seed Farms stock. On April 22, 1997, Kimberley transferred her six shares to Paul. Leland testified that it was his desire to give all 28 shares to Paul, but out of concern for the tax consequences, he chose to gift half of the shares to Kimberley, with the intent that she would transfer them to Paul at a later time. Both Paul and Kimberley were aware of Leland's intent when he made the gifts.

In its decree, the trial court awarded Kimberley 14 shares of Gangwish Seed Farms and the remainder to Paul. The shares were not assigned a value in the decree. On appeal, Paul argues that the trial court abused its discretion by awarding Kimberley 14 shares of his family's corporate stock because it was Leland's intention that Paul gain ownership of all 28 shares.

Our review of the trial court's decree suggests that the court determined that all 28 shares were marital property and simply allocated half to each party. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). Such exceptions include property accumulated and acquired through gift or inheritance. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

We agree the evidence showed that Leland wanted Paul to obtain eventual possession of all 28 shares of stock in Gangwish Seed Farms. However, the fact remains that Leland gave only 14 shares to Paul. Therefore, Paul is entitled to receive, as separate property, only the 14 shares of stock that he received from Leland as a gift. As to the 14 shares given to Kimberley, upon transferring ownership of the shares to Paul, they lost their status as a gift

and became part of the marital estate. Because no value was assigned to the shares, we conclude that the parties should divide these 14 remaining shares equally. On remand, the trial court is ordered to amend its decree to award Kimberley seven shares of stock in Gangwish Seed Farms and the remainder to Paul.

## 2. CHILD SUPPORT

In its decree, the trial court ordered Paul to pay child support in the amount of $1,567 per month. On appeal, Kimberley contends that this amount is too low. Specifically, Kimberley argues that the court should have (1) added to Paul's income the depreciation expenses taken by P.G. Farms and (2) deviated upward from the child support guidelines. Paul, on the other hand, argues that P.G. Farms is a separate corporate entity and that the court erred by adding P.G. Farms' income and/or depreciation expenses onto his income for purposes of determining child support.

The record shows that the trial court relied on the parties' federal joint tax return for 2000 in establishing Kimberley's gross income for child support purposes. The tax return reported that K.F.G. had an income of $50,880 in 2000, or a monthly income of $4,240. Using worksheet 1, the trial court stated that Kimberley's monthly income was $4,240, or $50,880 annually. Neither Kimberley nor Paul questions the court's determination of Kimberley's income.

As for Paul, the court stated that his monthly income was $10,208, or $122,497 annually. Both parties agree that it is unclear how the court arrived at this amount. The court may have used the parties' 2000 federal income tax return which claimed $122,424 in total income from both parties. However, this number includes, among other sources of income, K.F.G.'s earnings, e.g., Kimberley's income. The record does show that P.G. Farms paid Paul $6,000 in salary and that Paul received $1,500 in director fees from Platteland, Inc. The parties' joint tax return also shows they received income from other sources, such as rental income and capital gains. However, as Paul notes, even if these additional sources of income were attributed to Paul, his total monthly income would be substantially less than $10,208. Therefore, it is reasonable to conclude that the trial court, in calculating Paul's income, included some amount of income from P.G. Farms.

## (a) Paul's Income

On appeal, Kimberley contends that the court should have added the depreciation expenses taken by P.G. Farms to Paul's income. Paul, on the other hand, argues that P.G. Farms is a separate corporate entity and that, therefore, neither P.G. Farms' income nor its depreciation expenses are relevant to his income for child support purposes.

The paramount concern and question in determining child support, whether in the initial marital dissolution action or in the proceedings for modification of decree, is the best interests of the child. *Claborn v. Claborn, ante* p. 201, 673 N.W.2d 533 (2004). The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective incomes. *Noonan v. Noonan,* 261 Neb. 552, 624 N.W.2d 314 (2001). In general, child support payments should be set according to the Nebraska Child Support Guidelines, which compute the presumptive share of each parent's child support obligation. *Claborn, supra.*

The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income, defined as the income of both parties derived from all sources, except all means-tested public assistance benefits and payments received for children of prior marriages. *Marcovitz v. Rogers, ante* p. 456, 675 N.W.2d 132 (2004); Nebraska Child Support Guidelines, paragraph D. In the past, we have not set forth a rigid definition of what constitutes "income," but have instead relied on a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Workman v. Workman,* 262 Neb. 373, 632 N.W.2d 286 (2001). Thus, income for the purpose of child support is not necessarily synonymous with taxable income. *Gase v. Gase,* 266 Neb. 975, 671 N.W.2d 223 (2003); *Rhoades v. Rhoades,* 258 Neb. 721, 605 N.W.2d 454 (2000); *Rauch v. Rauch,* 256 Neb. 257, 590 N.W.2d 170 (1999).

We take a flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. Thus, a court is allowed, for example, to add "in-kind"

benefits derived from an employer or third party to a party's income. See, *Workman, supra*; *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998); *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994). Likewise, we believe that a party's income, for purposes of determining child support, does not necessarily stop at the corporate structure of a closely held corporation. Although, ordinarily, a corporation is regarded as a separate entity, distinct from the members who compose it, equity allows a court to disregard the corporate veil when necessary to do justice. See *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002). As noted previously, "justice," in child support determinations, is the best interests of the child. *Claborn, supra*.

Thus, we determine that under the appropriate factual circumstances, equity may require a trial court to calculate a party's income by looking through the legal structure of a closely held corporation of which the party is a shareholder. Stated otherwise, equity may demand that a court consider as income the earnings of a closely held corporation of which a party is a shareholder. The real question, however, is deciding what type of factual scenario justifies casting aside the corporate identity to place corporate income on the shareholder's side of the ledger. While the following is by no means meant to be exclusive, the facts of the instant case provide such an example:

The record establishes that throughout its existence, P.G. Farms has been used to pay for many of the parties' living expenses. For example, not only does P.G. Farms own the home in which the parties lived, it also paid for many of the costs of home ownership, including utilities, real estate taxes, homeowners insurance, yard care, and pool maintenance. In addition, P.G. Farms purchased the family's groceries and a number of the household furnishings, including a theater system, a washer and dryer, and bar stools. As Paul testified, "my salary from PG Farms is $6,000 a year. But there's other benefits from the company that we have had since the company was established that I would call a benefit in lieu of salary."

As mentioned previously, Kimberley and Paul were the sole and equal owners of P.G. Farms. In its decree, the trial court awarded Kimberley half of the value of P.G. Farms' assets. However, the court awarded Paul all of the shares of P.G. Farms'

stock, thereby making him the sole owner of P.G. Farms. Thus, where P.G. Farms was once used to supplement the parties' income by paying for a number of the family's living expenses, P.G. Farms' considerable revenue stream will now inure solely to the benefit of Paul.

In addition, the evidence reveals that throughout the parties' marriage, Paul was in sole control of the parties', as well as P.G. Farms', financial decisions. Therefore, the decision to treat P.G. Farms as the family's corporate piggy bank was Paul's. Likewise, the decision to pay Paul a salary of $6,000, while building value in the corporation, was Paul's. We note these facts not to question Paul's business decisions, but to show that Paul had, and continues to have, the ability to earn considerably more income than the $6,000 he receives from P.G. Farms. Moreover, the amount of salary and/or benefits in lieu of salary that Paul receives from P.G. Farms is, and will remain, Paul's decision.

In cases such as these, a trial court should not only add "in-kind" benefits derived from an employer to a party's income, see *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001), but should also take into consideration the party's actual earning capacity. Nebraska Child Support Guidelines, paragraph D. See, also, *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001) (noting importance of determining party's actual earning capacity in child support cases); *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991) (same). The need to examine a party's earning capacity is "especially true when it appears that the parent is capable of earning more income than is presently being earned." *Rauch v. Rauch*, 256 Neb. 257, 264, 590 N.W.2d 170, 175 (1999). Moreover, while we do not doubt that building equity in a corporation in lieu of taking salary can be a wise business decision, the "support of one's children is a fundamental obligation which takes precedence over almost everything else." *Id.* at 263-64, 590 N.W.2d at 175. Here, it would simply be inequitable for Paul's children to suffer because of his decision to build value in P.G. Farms by depressing his salary. See *id*. See, also, *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003); *Gammel v. Gammel*, 259 Neb. 738, 612 N.W.2d 207 (2000); *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994).

We note that our resolution of this matter is not unique. A number of courts have determined that perquisites supplied by a business to an employee, or a closely held corporation to a shareholder, should be considered as income for purposes of determining child support. See, *Mascaro v. Mascaro*, 569 Pa. 255, 803 A.2d 1186 (2002); *Clark v. Clark*, 172 Vt. 351, 779 A.2d 42 (2001); *Heisey v. Heisey*, 430 Pa. Super. 16, 633 A.2d 211 (1993); *Com. ex rel. Gutzeit v. Gutzeit*, 200 Pa. Super. 401, 189 A.2d 324 (1963). In addition, when a sole or majority shareholder uses the closely held corporation to pay for numerous personal expenses, courts have been willing to pierce the corporate veil and treat the corporation's income as the shareholder's own. See, *Morgan v. Ackerman*, 964 S.W.2d 865 (Mo. App. 1998); *Palazzo v. Palazzo*, 9 Conn. App. 486, 519 A.2d 1230 (1987); *Hurd v. Hurd*, 397 So. 2d 133 (Ala. Civ. App. 1980). Similarly, when a party is the sole or majority shareholder of a closely held corporation and determines his or her own salary, courts have been willing to pierce the corporate veil for the purpose of determining the party's income for child support. See, *Bleth v. Bleth*, 607 N.W.2d 577 (N.D. 2000); *Ochs v. Nelson*, 538 N.W.2d 527 (S.D. 1995); *Mitts v. Mitts*, 39 S.W.3d 142 (Tenn. App. 2000); *Morgan, supra*; *Isanti County v. Formhals*, 358 N.W.2d 703 (Minn. App. 1984); *Com. ex rel. Maier v. Maier*, 274 Pa. Super. 580, 418 A.2d 558 (1980). Simply put, courts throughout the nation have been unwavering in their attempt to reach an equitable outcome when it comes to determining a party's income for child support.

In sum, the court was within its discretion to look to P.G. Farms to determine Paul's income for child support purposes. However, we remain unable to determine how the trial court arrived at $10,208 as Paul's net monthly income. In any event, such a determination is a factual matter best left to the discretion of the trial court, and because we remand for a new determination of Paul's income, we need not dwell on this issue any further.

During the hearing on Kimberley's motion for a new trial, the trial court made it clear that it did not include P.G. Farms' depreciation expenses when determining Paul's monthly income. The record shows that in 1999, P.G. Farms had a gross income of over $1.08 million and took a $189,700 writeoff for depreciation.

Among other deductions, P.G. Farms' depreciation writeoff left it with a taxable income of $48,589. As noted above, Kimberley contends that the court should have included P.G. Farms' depreciation expenses when determining Paul's income.

Paragraph D of the Nebraska Child Support Guidelines, which discusses the proper treatment of depreciation expenses, was amended effective September 1, 2002. However, we must turn to the provision in effect at the time the dissolution action was filed. That provision states, "If a party is self-employed, depreciation claimed on tax returns should be added back to income or loss from the business or farm to arrive at an annualized total monthly income." Nebraska Child Support Guidelines, paragraph D. Thus, under usual circumstances, before we could add claimed depreciation to Paul's income, we would need to determine if Paul should have been considered as self-employed. See, *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003); *Gammel v. Gammel*, 259 Neb. 738, 612 N.W.2d 207 (2000).

These, however, are not the usual circumstances. In the instant case, equity compels us to disregard the corporate entity, of which Paul is the sole shareholder, to determine Paul's true income. Thus, the measure of Paul's income is driven, in large part, by the profitability of his closely held corporation, P.G. Farms. Therefore, it is imperative that the court determine P.G. Farms' true income. To that end, corporate income, much like individual income, at least for the purposes of child support, is not necessarily synonymous with taxable income.

Under these circumstances, we determine that depreciation expenses must be considered in determining P.G. Farms' income. Otherwise, Paul would be allowed to benefit from his choice to build equity in P.G. Farms by taking depreciation and lowering profits. See, *Gase, supra*; *Gammel, supra*. Obviously, such a situation would work against the best interests of Paul's children because Paul would have a tax incentive to keep P.G. Farms' income as low as possible. Thus, the depreciation reported on P.G. Farms' tax returns must be added back to its income. See *Gammel, supra* (noting that for child support purposes, Nebraska Child Support Guidelines treat depreciation as book figure which does not involve any cash outlay or reduce actual dollar income and, therefore, should not be allowed as deduction).

In sum, we determine that the court did not abuse its discretion by looking to P.G. Farms to determine Paul's income. However, we conclude that the court abused its discretion by failing to add P.G. Farms' depreciation expenses to P.G. Farms' income before looking to P.G. Farms' income to determine Paul's income. Therefore, we reverse, and remand for a new determination of Paul's income. On remand, when determining Paul's income, the trial court should consider, in addition to looking to Paul's reported income, (1) the in-kind benefits, e.g., perquisites, that Paul receives from P.G. Farms; (2) P.G. Farms' depreciation expenses; and (3) with due regard for business realities, the amount of P.G. Farms' income which should equitably be attributed to Paul.

### (b) Upward Deviation

The trial court determined that after deductions, Paul and Kimberley had a monthly net income of $10,132.69, or $121,592.26 annually. Kimberley contends that the court should have deviated upward from the child support guidelines. Because we remand for a new determination of Paul's income, we need not decide if the trial court erred in failing to deviate upward from guidelines.

### 3. ATTORNEY FEES

Paul argues the trial court erred in ordering him to pay Kimberley $10,000 in attorney fees. In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Mathews v. Mathews, ante* p. 604, 676 N.W.2d 42 (2004). As noted previously, Paul was awarded a sizeable amount of the marital assets, including all the shares of stock in P.G. Farms, household goods and furnishings, and 320 acres of land in Buffalo County. In addition, as the sole shareholder of P.G. Farms, Paul will continue to reap the benefit of its substantial income stream. Thus, under these circumstances, we cannot say the trial court abused its discretion by awarding Kimberley $10,000 in attorney fees.

### VI. CONCLUSION

For the foregoing reasons, the trial court's property division is affirmed with respect to ownership of the marital residence, the

accounting of Kimberley's student loans, and the accounting of Paul's premarital funds. With respect to the division of shares in Gangwish Seed Farms, we conclude that the trial court abused its discretion and remand with directions to award Kimberley seven shares of stock in Gangwish Seed Farms and the remainder to Paul. As to child support, we conclude that the trial court erred in its determination of Paul's income, and remand for a new income determination in accordance with this opinion. Finally, we conclude that the trial court did not abuse its discretion by ordering Paul to pay Kimberley $10,000 in attorney fees.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.