Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/06/2021 08:09 AM CDT

**Sarah Elizabeth Ramsey, appellee, v.
Kyle Patrick Ramsey, appellant.**

___ N.W.2d ___

Filed March 30, 2021.    No. A-20-035.

1. **Divorce: Appeal and Error.** In a marital dissolution action, an appellate
   court reviews the case de novo on the record to determine whether there
   has been an abuse of discretion by the trial judge.
2. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue
   2016), the equitable division of property is a three-step process. The first
   step is to classify the parties' property as marital or nonmarital, setting
   aside the nonmarital property to the party who brought that property to
   the marriage. The second step is to value the marital assets and marital
   liabilities of the parties. The third step is to calculate and divide the net
   marital estate between the parties in accordance with the principles con-
   tained in § 42-365.
3. ____: ____. The ultimate test in determining the appropriateness of the
   division of property is fairness and reasonableness as determined by the
   facts of each case.
4. ____: ____. Generally, all property accumulated and acquired by either
   spouse during a marriage is part of the marital estate. Exceptions
   include property that a spouse acquired before the marriage, or by gift
   or inheritance.
5. **Property Division.** Any given property can constitute a mixture of mari-
   tal and nonmarital interests; a portion of an asset can be marital property
   while another portion can be separate property.
6. **Property Division: Proof.** Separate property becomes marital property
   by commingling if it is inextricably mixed with marital property or with
   the separate property of the other spouse. But if the separate property
   remains segregated or is traceable into its product, commingling does
   not occur. The burden of proof rests with the party claiming that prop-
   erty is nonmarital.

7. **Divorce: Property Division: Proof: Testimony.** A nonmarital interest in property may be established by credible testimony.
8. **Trial: Witnesses: Evidence.** Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof.
9. **Divorce: Property Division.** Debts, like property, ought to also be considered in dividing marital property upon dissolution.
10. ____: ____. When one party's nonmarital debt is repaid with marital funds, the value of the debt repayments ought to reduce that party's property award upon dissolution.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed as modified.

Virginia A. Albers and Dennis G. Whelan, of Slowiaczek Albers, P.C., L.L.O., for appellant.

Donald A. Roberts and Justin A. Roberts, of Lustgarten & Roberts, P.C., L.L.O., for appellee.

Bishop, Arterburn, and Welch, Judges.

Bishop, Judge.
The Washington County District Court dissolved the marriage of Sarah Elizabeth Ramsey and Kyle Patrick Ramsey and divided the parties' property and debts. On appeal, Kyle challenges the district court's decision (1) to not award him credit for his premarital interest in proceeds from the sale of a home and (2) to award him a credit for only one-half of the amount of Sarah's premarital student loan debt that was paid off with marital funds. We affirm as modified.

## BACKGROUND

Sarah and Kyle married in May 2011. Sarah filed a complaint for dissolution of the marriage on October 2, 2018, seeking an equitable division of the parties' property and debts. In his answer and "[c]ountercomplaint," Kyle alleged that his nonmarital assets should be awarded to him and that only the marital property and debts should be equitably divided between the parties.

Trial was held in November 2019. Sarah and Kyle both testified, and numerous exhibits were received into evidence. We include only that evidence from trial which is relevant to the issues on appeal.

Sarah and Kyle started dating in 2006. At that time, Kyle lived in Kearney, Nebraska, in a home he purchased in 2002. Kyle was employed as a corporate pilot. Beginning in 2009, Kyle also had an ownership interest in, and did work for, Midwest Management Solutions, a company that managed airplanes.

When the parties started dating in 2006, Sarah was a student in Kearney, and then went to nursing school in Omaha, Nebraska. Sarah earned a bachelor of science degree in nursing in 2010, and then she moved back to Kearney to live with Kyle in his home. She worked as a waitress until she passed her licensing examination for nursing, and then she began her job as a nurse in June. The parties also got engaged that year.

When the parties started living together in 2010, Kyle already had a checking account ending in "6484" (checking account #6484) and a savings account ending in "6105" (savings account #6105); he deposited his earnings into his checking account #6484. Sarah deposited her paycheck into her own account, and then she put money into Kyle's checking account #6484 each month for living expenses and the mortgage.

The parties married in May 2011. Sarah continued to transfer money to checking account #6484 and/or savings account #6105 throughout the marriage. Additionally, throughout the marriage, there were recurring transfers from checking account #6484 to savings account #6105; the number of transfers varied each month. Money was also being transferred from savings account #6105 to checking account #6484; the frequency of the transfers and the amounts of the transfers varied. In December 2012, Kyle sold his ownership interest in Midwest Management Solutions and deposited the proceeds of that sale, $145,313, into savings account #6105. Sarah's name was added to checking account #6484 and savings account #6105

in December 2015. Sarah's paychecks from December 2015 through September 2018 were direct deposited into savings account #6105, and she also made various deposits into checking account #6484.

The parties agreed that Sarah's student loan balance of $43,258 was paid off during the marriage.

Kyle testified that he purchased the Kearney home in 2002 for $103,000. He then did "extensive" work on the home, including a full remodel and landscaping. He also made "additions on the front garage" and added "a 20 by 20 detached garage in the back." According to Kyle, all of the upgrades and construction were completed prior to the parties' marriage. After the marriage, "[t]here might have been some plants . . . replaced, but . . . no major renovations inside or out." However, according to Sarah's testimony, the detached garage was built during the marriage, and the parties replaced an old shed with a new one. Sarah also testified that she helped maintain the Kearney home and that the parties did all of the landscaping, got new carpeting, and painted.

The Kearney home was refinanced in January 2012, and Sarah's name was put on the home at that time. As part of the refinancing, the home was appraised, and the appraised value was $157,000. The Kearney home was sold in December 2015 for $198,000, with net proceeds of $125,454. The net proceeds were deposited into savings account #6105 on December 7.

In January 2016, the parties purchased land in Fort Calhoun, Nebraska. They subsequently built a home on that land and moved into that home in November. The parties agree that during the building process, they spent considerable sums of money for costs associated with the construction. Sarah moved out of the marital residence in August 2018.

Pursuant to the district court's decree entered on December 18, 2019, and its order nunc pro tunc entered on January 13, 2020, the parties' marriage was dissolved and their property and debts divided. As relevant to this appeal, the district court did not set aside any portion of the proceeds from the sale

of the Kearney home as Kyle's nonmarital property because it found that Kyle had not met his burden of proof in regard to tracing the nonmarital proceeds. The court concluded that it was "impossible to distinguish the Kearney net proceeds from the rest of the parties' deposits and therefore no credit should be given to [Kyle] from the sale of the Kearney home." With regard to Sarah's premarital student loan debt, Kyle was given a credit of $21,081.97 because the court determined that "half" of the marital funds used to pay off Sarah's premarital student loan "should be considered [Sarah's] and half should be considered [Kyle's]." And "[f]or that reason, only half of the student loan payoff should reduce [Sarah's] property award."

Kyle appeals.

## ASSIGNMENTS OF ERROR

Kyle assigns that the district court erred by (1) finding that he was not entitled to a credit for his premarital home and (2) crediting him an incorrect amount for the payment of Sarah's premarital student loans. Another error assigned by Kyle has since been resolved by stipulation of the parties and will therefore not be addressed in this opinion.

## STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

## ANALYSIS

### Premarital Interest in Kearney Home

Kyle argues that the district court erred by finding that he was not entitled to a credit for his premarital home.

[2-4] In a dissolution of marriage proceeding, "'[i]f the parties fail to agree upon a property settlement . . . the

court shall order an equitable division of the marital estate.'"
*Dooling v. Dooling*, 303 Neb. 494, 507, 930 N.W.2d 481, 495
(2019). Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the
equitable division of property is a three-step process. *Dooling
v. Dooling, supra*. The first step is to classify the parties'
property as marital or nonmarital, setting aside the nonmarital
property to the party who brought that property to the mar-
riage. The second step is to value the marital assets and mari-
tal liabilities of the parties. The third step is to calculate and
divide the net marital estate between the parties in accordance
with the principles contained in § 42-365. *Dooling v. Dooling,
supra*. The ultimate test in determining the appropriateness
of the division of property is fairness and reasonableness
as determined by the facts of each case. *Id*. Generally, all
property accumulated and acquired by either spouse during a
marriage is part of the marital estate. *Id*. Exceptions include
property that a spouse acquired before the marriage, or by gift
or inheritance. *Id*.

[5,6] Any given property can constitute a mixture of marital
and nonmarital interests; a portion of an asset can be mari-
tal property while another portion can be separate property.
*Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017).
Setting aside nonmarital property is simple if the spouse pos-
sesses the original asset, but can be problematic if the original
asset no longer exists. *Id*. Separate property becomes marital
property by commingling if it is inextricably mixed with mari-
tal property or with the separate property of the other spouse.
*Id*. But if the separate property remains segregated or is trace-
able into its product, commingling does not occur. *Id*. The
burden of proof rests with the party claiming that property is
nonmarital. *Id*.

[7,8] A nonmarital interest in property may be established
by credible testimony. *Burgardt v. Burgardt, supra*. A spouse's
own testimony can establish a ""tracing link,"" i.e., track-
ing an asset to a nonmarital source. *Id*. at 364, 934 N.W.2d at
495. See, also, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17

(2016). Of course, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra*. Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id*.

The parties agree that Kyle owned a home at the time of the marriage that was subject to a mortgage. Kyle argues that he "provided sufficient evidence of the value of the home at the time of marriage as it was appraised shortly after the parties got married." Brief for appellant at 11. At trial, Kyle provided evidence that he purchased the Kearney home in 2002 for $103,000, the mortgage at the time of the marriage in May 2011 was $86,945, and the home was appraised at $157,000 in January 2012. He calculated the premarital equity in the home at $70,055 ($157,000 − $86,945). The evidence at trial established that the Kearney home was sold for $198,000 in December 2015, with the net proceeds of $125,454 being deposited into savings account #6105 on December 7. The parties purchased land in Fort Calhoun in January 2016 for $95,269.46—a "Bank Check OR Draft" for this amount was withdrawn from savings account #6105 on January 25—and subsequently made other expenditures from savings account #6105 toward building a home on that land. Based on the immediate turnaround from depositing the Kearney home net proceeds into savings account #6105 on December 7, 2015, to withdrawing $95,269.46 from that same account for the Fort Calhoun land purchase in January 2016, the Kearney home net proceeds are certainly traceable to being invested in the Fort Calhoun property. The issue is how much of those Kearney home net proceeds were nonmarital.

The district court determined that Kyle did not meet his burden of proof to trace any nonmarital cash proceeds from the sale of the Kearney home as separate property because those nonmarital proceeds were commingled in the parties'

bank accounts with marital assets. The court found that Sarah contributed to checking account #6484 and savings account #6105 both before and after the date of the marriage and that it was "clear" that both parties were contributing to the payment of the mortgage obligation on the Kearney home through November 2015. After the home sold in December, the net proceeds were deposited into savings account #6105. And in January 2016, money was withdrawn from savings account #6105 to purchase land to build a new home. The court stated:

> By depositing the sale proceeds into the parties' joint account, those funds were com[m]ingled with not only the account balance in savings as of that time, but over time, the parties continued to use that money plus their incomes and monies from all other sources toward their new residence. Over time, it is impossible to distinguish the Kearney net proceeds from the rest of the parties' deposits and therefore no credit should be given to [Kyle] from the sale of the Kearney home.

Earlier in its decree, the court noted that "[i]n regard to the issue of com[m]ingling of marital and nonmarital cash proceeds," the exhibits showed that Kyle, "who handled the finances of the parties, commonly and regularly transferred monies of the parties back and forth" between checking account #6484 and savings account #6105. In addition, prior to and during the marriage, Sarah contributed thousands of dollars to those accounts, Kyle deposited marital earnings into those accounts, and "thousands of dollars of marital expenses and unaccounted-for withdrawals" were deducted from those accounts. The court stated, "Given the extensive com[m]ingling of marital and nonmarital funds, and the large amount of marital expenditures withdrawn, [Kyle] failed to meet his burden of proof in regard to tracing nonmarital contributions into these accounts."

Kyle contends he "provided sufficient evidence of the value of the [Kearney] home at the time of marriage as it was

appraised shortly after the parties got married." Brief for appellant at 11. He claims that the proceeds from the sale of the Kearney home "went towards payment of the parties' current home" in Fort Calhoun, *id.* at 13, and that using the bank statements in evidence, the payments are traceable. Kyle believes that his premarital portion of the proceeds from the sale of his Kearney home, $70,055, should be set aside as his separate, nonmarital property and that his share of the property division should be reduced by such an amount.

Sarah contends the trial court was correct in denying Kyle a credit for any premarital equity in the Kearney home. She points to her testimony that improvements, e.g., the garage and shed, were made to the property during the marriage; given these items were listed in the January 2012 appraisal, the implication from Sarah's testimony was that the improvements were made between May 2011, when the parties were married, and January 2012. She argues the appraisal completed 8 months after the parties' marriage was "at a time not rationally related to the home's value at the date of marriage, and there was no breakout of the value of the home with or without a new shop." Brief for appellee at 13. She also points out that the mortgage balance was reduced both when the parties were living together and during the marriage and that the sale proceeds were deposited into a joint account and commingled with marital funds such that it was impossible to distinguish the net proceeds from the sale of the home.

After reviewing the record, we conclude that although Kyle did have a premarital interest in the Kearney home, he did not meet his burden of proof as to the $70,055 value he calculated as his premarital interest. The district court focused much of its analysis on the commingling of the net sale proceeds with the marital funds in the parties' bank accounts; however, we focus our attention elsewhere. Kyle claims that his premarital equity in the home was $70,055—the difference between the January 2012 appraisal value and the May 2011 mortgage balance. But Sarah claims the appraisal value should not be

used because it was completed 8 months after the parties' marriage and did not contain a valuation of the home without the detached garage and/or shed, which, contrary to Kyle's testimony, she claims was added during the marriage. As noted previously, because the detached garage was listed in the January 2012 appraisal, the implication from Sarah's testimony was that the improvements were made between May 2011 and January 2012.

In its decree, the district court stated, "After listening to [Kyle's] testimony and observing his demeanor during trial, the Court has difficulty giving much weight to [his] testimony in regard to . . . alleged nonmarital assets without some type of corroborating evidence." Other than the parties' conflicting testimony, there was no evidence as to when the detached garage and/or shed was built. See *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020) (where credible evidence is in conflict on material issue of fact, appellate court considers, and may give weight to, fact that trial court heard and observed witnesses and accepted one version of facts rather than another). As noted by Sarah, the January 2012 appraisal did not include a value of the Kearney home without the detached garage and/or shed. And Kyle failed to put on any other evidence as to the value of those structures. The 2012 appraisal did not provide any information about when the detached garage and/or shed was built or what improvement value they added to the remainder of the property. Nor did Kyle testify about the value of those improvements. Without evidence as to the value of those items, and deferring to the district court's determinations regarding the credibility of conflicting facts on this issue, the 2012 appraisal is of little help. As a result, we cannot discern the fair market value of the Kearney home at the time of the parties' marriage in order to attribute any increase in premarital value from 2002 when Kyle purchased the home until the time of his marriage in May 2011.

That said, there is no question that Kyle had some amount of premarital value in the home, and Kyle's desire to receive

credit for his premarital interest in the Kearney home is understandable. This court's ability to set off the increase in premarital value for the home, however, is limited to the only verifiable information that appears in the record. The evidence at trial was that Kyle purchased the Kearney home in 2002 for $103,000, which was arguably its fair market value at that time. The mortgage at the time of the marriage in May 2011 was $86,945. These amounts were not disputed by Sarah. We therefore conclude that Kyle had at least $16,055 in equity in the home at the time of the marriage. That amount was traceable and verified by undisputed evidence, and it should have been set aside as Kyle's premarital interest in the home. The decree is modified to reflect this premarital interest; the impact on the marital equalization is addressed later in this opinion.

## Student Loan Payoff

Kyle argues that the district court erred by crediting him an incorrect amount for the payment of Sarah's premarital student loans that were paid off during the marriage with marital funds. At trial, the parties agreed that Sarah's student loan balance of $43,258 was paid off during the marriage. In its decree, the district court stated:

> [H]alf of the money in the checking and savings accounts[,] used to pay off the student loan, should be considered [Sarah's] and half should be considered [Kyle's]. For that reason, only half of the student loan payoff should reduce [Sarah's] property award. Therefore, the Court's Balance Sheet should give [Kyle] a credit of $21,081.97.

At the outset, Kyle points out that, despite the parties' agreement that Sarah's student loan balance of $43,258 was paid off during the marriage, the court's decree states that $42,163.94 was paid off during the marriage. However, in her brief, Sarah says the evidence shows the parties paid "approximately" $13,100 through September 2012 and then made a lump-sum payment of $29,063.94 on April 12, 2013, that paid off the balance of the student loans; therefore, the total paid during

the marriage was $42,163.94. Brief for appellee at 18. We note that one of the exhibits received into evidence at trial was a student loan billing statement showing a "Current Balance" of $43,258.38 as of July 24, 2011. We find that any discrepancy in the amount of marital funds used to pay off Sarah's premarital student loan debt was nominal and did not make the overall property distribution unfair or unreasonable. We will therefore continue to use $42,163.94 as the amount of Sarah's premarital student loan debt that was paid off with marital funds.

Kyle also argues that the district court erred by finding that he should receive a credit for only half of the amount of the premarital student loans that were paid off during the marriage. He claims Sarah's share of the property division should be reduced by $43,258, the full amount by which her student loans were reduced and paid off during the marriage; thus "a full credit of the premarital debt that was paid off with marital monies should be given to Kyle." Brief for appellant at 19.

[9,10] Debts, like property, ought to also be considered in dividing marital property upon dissolution. *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019). When one party's nonmarital debt is repaid with marital funds, the value of the debt repayments ought to reduce that party's property award upon dissolution. *Id*. See, also, *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

In *Gangwish v. Gangwish, supra*, the wife had approximately $12,000 in student loan debt at the time of the marriage, and the loans were paid off with marital funds during the marriage. When dissolving the parties' marriage and dividing marital property, the trial court failed to account for the entirety of the loans that the wife brought into the marriage. On appeal, the Nebraska Supreme Court determined that the wife's portion of the marital estate should have been reduced by the total student loan debt that she brought into the marriage because that debt was paid off with marital assets. *Id*. The court, however, found no abuse of discretion under the circumstances because the marital estate totaled well over

$1 million and the alleged mistake constituted less than one-half of 1 percent of this total. *Id.*

Sarah claims that the case law "does not indicate that 100% of the debt repayment should be restored to Kyle." Brief for appellee at 20-21. As Sarah points out, "To provide Kyle a credit of 100% of the amounts paid toward the student loan, would require the . . . Court to ignore that money Sarah had contributed to the marital estate before the debt was paid." *Id*. at 21. We agree.

In *Gangwish v. Gangwish, supra*, the Nebraska Supreme Court faulted the district court for failing to account for the entirety of the student loans that the wife brought into the marriage. However, the district court in the present case did account for the entirety of the student loans that Sarah brought into the marriage. During the parties' marriage, their marital estate was reduced by $42,163.94, the amount of Sarah's pre-marital student loan debt paid off with marital funds. Although not explicitly shown on the court's calculation attached to the decree, in order to account for the $42,163.94 reduction in the marital estate, the court necessarily restored that $42,163.94 to the marital estate by attributing it as a marital asset allocated wholly to Sarah. If, for example, that was the only marital "asset" between the parties, Sarah would have had to pay $21,081.97 to Kyle to equalize the estate; Kyle was entitled to his one-half share, not the whole. The court credited Kyle with his one-half share, although our method of calculation for reaching an equalization amount varies from that used by the district court, as we discuss next.

## EQUALIZATION MODIFICATION

The district court attached to the decree a table reflecting the allocation of property and debts and the resulting equalization amount. As pertinent here, the table reflects the following:

|  | **Sarah** | **Kyle** |
| --- | --- | --- |
| Subtotal of marital estate | $112,125.50 | $419,420.00 |
| Amount to equalize | $153,647.00 | ($153,647.00) |
| Subtotal | $265,772.50 | $265,773.00 |

Notably, the district court then took the equalization amount of $153,647, and reduced it to account for Kyle's premarital interests and Sarah's student loan debt as follows:

| | |
|---|---|
| Amount to equalize | $153,647.00 |
| Premarital savings | ($25,929.00) |
| Premarital checking | ($3,993.00) |
| Wildcat trailer | ($11,000.00) |
| Student loan debt | ($21,081.97) |
| FINAL EQUALIZATION AMOUNT | $91,643.03 |

Neither party assigned error to the method of calculation used by the district court despite an apparent error. The district court first calculateed a marital equalization amount. It then directly reduced the equalization amount by subtracting Kyle's various premarital assets and one-half of Sarah's student loan payoff. However, the setoffs for Kyle's premarital credits and the student loan debt should have been accounted for in determining the net marital estate *before* calculating the equalization. By using the same values and making adjustments in the net marital estate before calculating an equalization, Kyle's resulting equalization amount owed to Sarah becomes $122,645.27, instead of $91,643.03, as we illustrate in the table below.

| | **Sarah** | **Kyle** |
|---|---|---|
| Subtotal of marital estate | $112,125.50 | $419,420.00 |
| Premarital savings | | ($25,929.00) |
| Premarital checking | | ($3,993.00) |
| Wildcat trailer | | ($11,000.00) |
| Student loan debt | | ($21,081.97) |
| NET MARITAL ESTATE | $112,125.50 | $357,416.03 |

As noted, this calculation results in a marital equalization amount owed by Kyle of $122,645.27 ($357,416.03 − $112,125.50 = $245,290.53 ÷ 2), rather than $91,643.03 as determined by the district court.

In addition to the error in the method of calculation used, adjustments are needed to account for Kyle's premarital interest in the Kearney house ($16,055) and the entirety of Sarah's

student loan debt ($42,163.94). We point out that the district court's "credit" to Kyle for $21,081.97 of Sarah's student loan debt was not incorrect so long as it was included before calculating the net marital estate. But to avoid confusion related to the arguments about whether the whole or one-half of the debt should be included in the division of property, we include the entire premarital student loan debt as an asset attributable to Sarah. This makes it easier to see that the entire debt is being factored into the calculations. Therefore, when starting with the same subtotal amounts used above, and then using the correct method of calculation with these value adjustments, the modified equalization amount Kyle owes to Sarah is $104,076.78, as illustrated below:

|  | Sarah | Kyle |
| --- | --- | --- |
| Subtotal of marital estate | $112,125.50 | $419,420.00 |
| Add entire student loan debt | $42,163.94 |  |
| Revised subtotal | $154,289.44 | $419,420.00 |
| Premarital savings |  | ($25,929.00) |
| Premarital checking |  | ($3,993.00) |
| Wildcat trailer |  | ($11,000.00) |
| Premarital Kearney house |  | ($16,055.00) |
| NET MARITAL ESTATE | $154,289.44 | $362,443.00 |

As noted, the amount Kyle would owe to Sarah under this revised calculation is $104,076.78 ($362,443.00 − $154,289.44 = $208,153.56 ÷ 2). However, as also previously noted, neither party assigned any error related to the method of calculation used by the district court. We therefore consider whether the resulting difference between the court's determination of an equalization amount of $91,643.03 versus our revised equalization amount of $104,076.78 constitutes plain error. Plain error is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. See *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999).

We conclude the difference in the resulting calculation does not rise to the level of plain error. The total net marital estate

was worth $516,732.44. If Kyle pays Sarah the $91,643.03 equalization amount determined by the district court, Sarah will receive an adjusted net marital estate of $245,932.47 ($154,289.44 + $91,643.03), which equals 48 percent of the net marital estate. Kyle will receive $270,799.97 ($362,443 – $91,643.03), which equals 52 percent of the net marital estate. Our revised calculations resulting in an equalization of $104,076.78 would provide an equal split of the net marital estate. We cannot say that the receipt by Sarah of 48 percent rather than 50 percent of the net marital estate constitutes plain error. The overall distribution of the marital estate results in the receipt by each party of within one-third to one-half of the total marital estate. See *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020) (as general rule, spouse should be awarded one-third to one-half of marital estate, polestar being fairness and reasonableness as determined by facts of case).

## CONCLUSION

For the reasons stated above, we modify the decision of the district court to reflect (1) a credit of $16,055 to Kyle for his premarital interest in the Kearney house, (2) the placement of the entirety of Sarah's student loan debt as an asset in the property division formula, and (3) our revised calculations. However, finding no plain error in the district court's equalization amount when considered against our revised calculations, we affirm.

AFFIRMED AS MODIFIED.