IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SCHENCK V. SCHENCK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KIRSTEN M. SCHENCK, APPELLANT,

V.

MARK P. SCHENCK, APPELLEE.

Filed March 8, 2016.    No. A-15-719.

Appeal from the District Court for Sarpy County: WILLIAM B. ZASTERA, Judge. Affirmed.

Karen S. Nelson, of Carlson & Burnett, for appellant.

Angela M. Minahan, of Reinsch, Slattery, Bear & Minahan, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and IRWIN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Kirsten M. Schenck, now known as Kirsten M. Grove, appeals from the decree entered in the district court for Sarpy County dissolving her marriage to Mark P. Schenck. Kirsten challenges the portions of the decree concerning custody, division of property, responsibility for certain child-related expenses, and attorney fees. Finding no error, we affirm.

## II. BACKGROUND

Kirsten and Mark were married in July 1992 in North Dakota. They have four children: Allison, born in 1993; Nathan, born in 1995; Alecia, born in 2001; and Nolan, born in 2002. Allison was no longer a minor at the time Kirsten initiated this action in February 2014, and Nathan had reached the age of majority by the time the decree was entered in May 2015.

On February 12, 2014, Kirsten filed a complaint for dissolution of marriage, seeking joint legal custody and sole physical custody of the minor children. Mark filed an answer and

- 1 -

counterclaim for dissolution of marriage; he admitted joint legal custody was appropriate but sought sole physical custody.

During the pendency of the action, the parties executed a memorandum of understanding (MOU) concerning temporary custody and other issues, which granted Mark parenting time on alternating weekends from Thursday evening until Monday morning, and on every Wednesday evening until Thursday morning. In other words, Mark had the children 6 out of every 14 days, or 42% of the time. On August 19, 2014, Kirsten filed a motion alleging Mark was violating the MOU and requesting a temporary order concerning custody and other issues. On November 10, the court entered a temporary order containing the same parenting-time schedule as the MOU.

A bench trial was conducted over 4 days beginning on October 17, 2014, and ending on January 2, 2015. Kirsten's first three witnesses were long-time family friends who testified generally about their observations of Kirsten and Mark's family over the past 14 to 15 years. The witnesses described Kirsten as a stay-at-home mother who was the children's primary caretaker, while they described Mark as the family breadwinner. More than one witness described Kirsten as "structured," while Mark appeared more "laid back," and one witness described Kirsten's household as a "well-oiled machine." The witnesses testified that due to Mark's military career, Kirsten was responsible for meeting the children's day-to-day needs during Mark's deployments.

Between the first and second witnesses, Mark's counsel interrupted to clarify that legal custody of the minor children was not in dispute and that the disputed custody issues were "who has primary possession and the division of parenting time." Kirsten's counsel agreed regarding legal custody and then stated: "And I think the temporary is 60/40. And I know [Mark] wants 50/50. So that's where the disparity is."

Kirsten's fourth witness was her mother, Diane Bring. She described Kirsten as the children's primary caregiver and testified that Kirsten cooked healthy meals, maintained a neat and organized home, assigned the children chores, ensured they finished their homework, and did fun activities with them. According to Diane, she wrote a check to Kirsten and Mark for $20,000 as a gift she hoped Kirsten would use to remodel the kitchen in the parties' home on South 26th Street Circle in Bellevue, Nebraska, which the record reflects the parties purchased in 2006. Diane explained the only reason she wrote the check to both of them was to avoid gift taxes.

Kirsten was next to testify. According to Kirsten, at the time she and Mark married, Mark was in the Navy and stationed in Florida. Thereafter, the family was stationed in Maine from 1993 until 1996, then in Florida again until 2000, and then in Bellevue, where the family lived at the time of trial. Kirsten testified Mark retired from the military in 2011, when he transitioned to full-time non-military employment.

Kirsten testified in great detail regarding her history of caring for the children while Mark was either deployed or working full-time. Consistent with the prior witnesses, Kirsten painted a picture of an organized and caring mother who satisfied all of her children's needs, involved them in activities, helped them with homework, and taught them responsibility. Because Kirsten's abilities as a parent are not in dispute, we need not summarize this aspect of Kirsten's testimony further.

Kirsten testified she completed her bachelor's degree in early childhood education during the beginning of the marriage but never obtained her teaching certificate or worked outside the

home. During the divorce proceedings, Kirsten obtained a part-time position as an "instructional para" at an elementary school, which allowed her to work while the children were in school.

Addressing the issue of custody, Kirsten testified she understood Mark was "wanting the kids week on, week off." By contrast, Kirsten wanted to maintain the current parenting time schedule reflected in the temporary order. On cross-examination, when asked why she sought to maintain the "60/40" schedule, Kirsten testified she had always been "the anchor" and "the root" and had been the parent who "put on many hats" and provided consistency while Mark was either deployed or working.

Although Kirsten testified she wanted to maintain the schedule reflected in the temporary order, the proposed parenting plan she presented to the court provided for Mark having the children 5 out of every 14 days during the school year and 6 out of every 14 days during the summer; assuming a 10-week summer break, this would amount to Mark having the children approximately 135 days per year, or 37% of the time.

Kirsten was concerned about Mark's proposed parenting schedule because of his "communication" and "inconsistency." At one point, she described Mark's recent communication as "bullying." She described one instance in September 2014 when Mark removed a number of items from the house, which Kirsten believed he was not supposed to do until the divorce was finalized. She and Mark had a confrontation in the driveway during which Mark called Kirsten a "fucking bitch" or a "psycho bitch."

Kirsten also expressed concern over Mark's inconsistency with things such as keeping track of the children's calendars and school responsibilities. As a specific example, Kirsten explained Nathan had an individualized education plan that required a parent to review and sign a school planner; however, Mark failed to timely sign it on certain occasions following the parties' separation. Kirsten acknowledged Mark had been more active in the children's lives following his retirement from the military and even more so since the divorce began, including by cooking hot breakfasts for the children.

Kirsten discussed a few recent incidents involving the children. She testified that while she was preparing for Nathan's graduation party, which was after the divorce proceedings began, Mark gave her one day's notice he and Nathan were leaving to visit a college Nathan was interested in attending; it upset her because she had to stay home to prepare for the party. She testified that approximately one week prior to the graduation party, she and Nathan got into an altercation in which Nathan pushed her into a doorway, causing a large bruise on her elbow. In response, she pushed Nathan, and he scraped his ankle. Mark stood by watching and never talked to Nathan about shoving Kirsten.

Addressing the parties' marital residences, Kirsten testified the family had lived in a home on South 26th Street Circle (26th Street home) since 2006. Kirsten believed the home's value was $248,695, which she based on the Sarpy County Assessor's valuation. The balance of the mortgage was $246,001, leaving equity of approximately $2,694. According to Kirsten, her mother gave her $20,000 toward remodeling the home. Kirsten requested that she be awarded the 26th Street home, because the children had lived there for 8 years and were connected to the home and neighborhood.

Kirsten further testified she and Mark purchased a home on South 38th Street in Bellevue (38th Street home) in 2000. When the family moved to the 26th Street home, they began renting

the 38th Street home. Based on the Sarpy County Assessor's valuation, Kirsten believed the 38th Street home's value was $148,755, and the mortgage balance was $111,412, leaving equity of $37,343.

Kirsten also requested that she be awarded the parties' 2011 Honda Odyssey minivan, which she believed was worth $21,900, based on a used car valuation website, and was encumbered by a $14,800 loan. According to Kirsten, the parties also owned a 2002 Toyota Camry, driven by Allison, which was worth $3,350 and unencumbered. Kirsten testified that while the dissolution action was pending, Mark sold the parties' 1995 Ford F-150 for $3,500 and used the funds to purchase a 2008 Ford Taurus for Nathan. Kirsten did not claim any ownership interest in the Taurus but believed the $3,500 was marital property. Kirsten further testified that, also during the divorce proceedings, Mark traded in the parties' 2005 Acura and purchased a 2013 Ford F-150. Kirsten did not claim any ownership interest in the F-150 but believed the $14,774 Mark received for the trade-in of the Acura was marital property.

After Kirsten rested, Mark called Allison, the parties' oldest daughter, as his first witness. Allison, who was 21 years old at the time of trial, testified that in August or September 2014, she moved in with her father following a disagreement with her mother about the divorce. She testified she had seen her mother strike her father on one occasion; she had never seen her father strike her mother but had seen him "push her away from him." She had witnessed her mother "push everything off" a table in anger; incidents like that occurred "once in a while." Asked what custody arrangement would be best for her younger siblings, Allison believed they should be raised equally by both parents.

Mark testified in detail regarding his career in the military and history of deployments, which generally was consistent with Kirsten's testimony; however, Mark testified there were years-long periods with no deployments, including from 1996 until 2001 and from summer 2004 until summer 2008.

Mark testified that following his retirement from the military, he began working full-time at Calvert Systems, where he continued to work at the time of trial. His employer had granted him leniency in connection with meeting his parental responsibilities. In addition to his salary, Mark received military retirement and disability payments. The parties also received an adoption subsidy for Alecia and Nolan.

When asked why he was requesting an alternating week parenting time schedule, Mark testified, "we're both good parents and we're both needed parents for Alecia and Nolan." He believed the children would benefit from being with Kirsten, who was "meticulous," and would benefit from being with him, who was "more laid back."

Addressing the examples of "inconsistency" raised by Kirsten, Mark explained he did not timely sign Nolan's planner on one occasion because Nolan did not bring it home. Mark also did not sign it during the 2-week period he was moving into the 38th Street home; Mark explained the house was in poor condition and he spent every "spare moment" painting or doing repairs. Since then, Mark had kept up with the planner and texted Kirsten whenever he noticed Nolan was having "an issue" in school. Mark testified that during the parties' separation, Nolan's and Alecia's performance in school had improved. Alecia received a certificate for "Most Improved Student," and Nathan's reading and math scores had improved. Mark testified he assisted the children with

homework, and that, historically, he had assisted with homework more than Kirsten once the children entered high school.

Mark requested that he be granted "final say" in the event of an impasse on child-related decisions. Mark explained that although Kirsten was a "fantastic" mother and person, he was concerned about what would happen when Kirsten got upset. He was concerned she would "use being able to make decisions against [Mark] if she's given that authority." If granted final decisionmaking authority, Mark believed he would be "level headed" and would "do what's best" and "not be biased."

Mark also addressed the last-minute trip with Nathan to visit the college. He explained there were two scholarships left and the baseball coach said he would "talk scholarships" if Nathan visited. Although Kirsten could not go on the trip, during the visit, when the coach offered Nathan a scholarship, Mark asked whether he could hold the offer until Kirsten had an opportunity to visit, to which the coach agreed. Mark testified that following the visit, he took 2 days off work to help prepare for the graduation party.

Mark also addressed the altercation between Nathan and Kirsten prior to the graduation party. According to Mark, the dispute arose out of Nathan's refusal to dust a bookshelf in his room. He testified Nathan pushed Kirsten toward the door, he did not shove her; Mark did not know Kirsten hurt her elbow until the next day when he saw it and asked her what happened. After the incident, Nathan cried on Mark's shoulder and asked "why Mom had to be that way." Mark told him "she was just upset."

Mark admitted there had been times when he and his son had "gone nose to nose," but testified he never lost his temper "to where [Kirsten] does." Mark also admitted he called Kirsten a "psycho bitch" during the confrontation in the driveway; he explained he was frustrated over what should have been an easy property exchange. On cross-examination, Mark admitted to breaking a dish in the sink in anger on one occasion.

Mark testified he was living in the parties' 38th Street home, which he estimated was worth $147,100 with a mortgage balance of $109,774, leaving equity of $37,326. He believed the parties' 26th Street home was worth $305,000, with a mortgage balance of $242,050, leaving equity of $62,950. Mark based his valuation on his "research and legwork," including contact with a realtor.

Mark requested that the 26th Street home be ordered sold and the 38th Street home be awarded to Kirsten. Mark did not believe he or Kirsten could afford the 26th Street home while living separately and financing two households. Mark estimated the monthly expenses for the 26th Street home, including mortgage and utilities, to be approximately $2,290; while the expenses for the 38th Street home were approximately $1,539. Mark believed the expenses for the 26th Street home would rise if Kirsten were required to refinance the mortgage, because the current 3.5% mortgage interest rate was based on a Veterans' Administration loan. Mark had no objection to both homes being sold.

Addressing the parties' vehicles, Mark believed the 2011 Honda Odyssey was worth approximately $25,000, and he submitted an exhibit showing the balance of the loan as $11,236 as of September 2014. He testified additional payments had been made since then, bringing the balance to an estimated $9,900. Mark testified that when he traded in the 2005 Acura, the dealership gave him a "trade-in allowance" that increased the trade-in value from approximately

$6,850 to $14,774. He obtained the $6,850 figure from a used car valuation website. Mark believed the 2002 Toyota Camry driven by Allison was worth $3,500, and he agreed he sold the 1995 Ford F-150 for $3,500, which he used to purchase a car for Nathan.

After Mark rested, Kirsten presented no rebuttal testimony. The court took the matter under advisement and entered a decree of dissolution of marriage on May 22, 2015. The decree indicated the court made findings on February 13 and clarified its findings on March 27, and stated the findings were "incorporated herein by reference" and "attached hereto." However, the findings are not attached to the decree or otherwise located in the record.

In the decree, the court found it was in the minor children's best interests that Kirsten and Mark be awarded joint legal and physical custody. The court approved and adopted the parenting plan proposed by Mark, which was nearly identical to the parenting plan proposed by Kirsten. The only material differences were that the court-approved parenting plan provided for joint legal and physical custody on an alternating week basis, and provided that although the parents were to make child-related decisions jointly, Mark had the "final say" in the event of an impasse.

The decree ordered the parties' marital residences to be sold, with the proceeds to be split equally. The court ordered the party occupying each residence to be responsible for associated expenses pending the sales. The decree granted Kirsten the 2011 Honda Odyssey and granted Mark the 2013 Ford F-150, 2008 Ford Taurus, and 2002 Toyota Camry. The parties were each assigned the debts associated with their respective vehicles. The court awarded Kirsten a Templeton Fund retirement account as "an offset for [Mark's] motor vehicle exchanges." The remainder of the parties' retirement accounts were split equally.

The decree awarded Kirsten alimony of $2,500 per month for the first year, $2,000 per month for the second year, and $1,500 per month for an additional 8 years. It awarded her the adoption subsidy of $1,338 per month and child support of $266 per month, which was the guideline amount minus one half of the adoption subsidy. Kirsten was also awarded $1,644 per month as her share of Mark's military retirement pay. Each party was ordered to bear responsibility for his or her own attorney fees.

On May 27, 2015, Kirsten filed a motion for new trial and on June 17, she filed an amended motion for new trial. The district court overruled the amended motion for new trial on July 6, and Kirsten timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Kirsten assigns, renumbered and consolidated, that the district court erred (1) in awarding joint physical custody and granting Mark the "final say"; (2) in its valuation and division of property, specifically the marital residences and motor vehicles; (3) in its allocation of responsibility for extracurricular activity, education, and other extraordinary expenses; and (4) in not awarding Kirsten attorney fees.

### IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's

determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

As stated, Kirsten challenges the portions of the decree concerning custody, division of property, responsibility for certain child-related expenses, and attorney fees.

### 1. CUSTODY

### (a) Joint Physical Custody

Kirsten challenges the court's award of joint physical custody on two bases. First, relying on *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007), she contends that because neither party requested joint physical custody in his or her pleadings, she was denied due process when the court awarded joint physical custody following trial. Second, she contends the evidence did not support an award of joint physical custody.

In an action for dissolution of marriage involving the custody of minor children, the court is required to make a determination of legal and physical custody based upon the children's best interests. Neb. Rev. Stat. § 42-364(1)(b) (Cum. Supp. 2014). The court may grant the parties joint legal custody or joint physical custody, or both, if either (a) both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the children or (b) the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor children regardless of any parental agreement or consent. § 42-364(3).

In *Zahl, supra*, neither party requested joint physical custody of the parties' minor child. At trial, although the mother testified she would cooperate on a joint custody schedule, each party's evidence focused on showing he or she would be the best sole custodian. The trial court ordered joint physical custody, and the Nebraska Supreme Court reversed. The court determined that a trial court's authority to order joint physical custody when the parties have not requested it must be exercised in a manner consistent with procedural due process. *Id*. Accordingly, the court held, when a trial court determines at a general custody hearing that joint physical custody is or may be in a child's best interests, but neither party has requested this arrangement, the court must give the parties an opportunity to present evidence on the issue before imposing joint custody. *Id*.

*Zahl* is distinguishable. Although neither Kirsten nor Mark requested joint physical custody in his or her pleadings, it was apparent at trial that Kirsten had notice Mark was seeking joint physical custody. After Kirsten's first witness testified, Mark's attorney interrupted to clarify that only physical custody, not legal custody, was in dispute; Kirsten's counsel agreed and stated: "And I think the temporary is 60/40. And I know [Mark] wants 50/50. So that's where the disparity is." Furthermore, Kirsten understood Mark was "wanting the kids week on, week off." Kirsten wanted to maintain the "60/40" parenting time schedule reflected in the temporary order, and she presented evidence in opposition to Mark's proposed schedule and in support of her proposed schedule.

Because Kirsten had notice Mark was seeking joint physical custody, and because she had an opportunity to present evidence in opposition to Mark's proposed custody arrangement, we conclude Kirsten was afforded procedural due process. We further note that although the parenting-time schedule in Kirsten's proposed parenting plan was a sole custody arrangement, at trial Kirsten testified she wished to maintain the schedule in the temporary order. Under the temporary order, Mark had the children 6 out of every 14 days or 156 days per year, which exceeds the threshold for using the joint physical custody worksheet when calculating child support. See Neb. Ct. R. § 4-212 (rev. 2011). Indeed, Kirsten used the joint physical custody worksheet to calculate the child support she proposed to the court, as reflected in her exhibit 29 received into evidence, which further undermines her contention that she was denied due process.

We now turn to the merits of the court's award of joint physical custody. The Parenting Act, Neb. Rev. Stat. § 43-2920 *et seq.* (Cum. Supp. 2014), defines "joint physical custody" as "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12). The Nebraska Supreme Court has said joint physical custody must be reserved for those cases where, in the trial court's judgment, the parents are of such maturity that the arrangement will not operate to allow the children to manipulate the parents or confuse the children's sense of direction, and will provide a stable atmosphere for the children to adjust, rather than perpetuating turmoil or custodial wars. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

As an initial matter, it bears repeating that the parties agreed to joint legal custody, and that the dispute concerning physical custody came down to Kirsten's proposed "60/40" schedule and Mark's proposed "50/50" schedule. As we noted above, Kirsten's testimony at trial suggested she sought joint physical custody, with Mark having the children 156 days per year as he did under the temporary order. Regardless, the award of joint physical custody was not an abuse of discretion, as we now explain.

In support of her proposed parenting-time schedule, Kirsten presented evidence of her detail-oriented and organized style of parenting, which was undisputed. It is clear Kirsten provided the children a structured, stable, and nurturing home environment during Mark's military career and after his retirement.

While Kirsten presented evidence of Mark's alleged "inconsistency" as a parent, none of the incidents she described engenders serious doubt about Mark's parenting abilities. Mark gave credible explanations for his failures to timely sign Nolan's school planner. Moreover, Mark presented evidence showing Nolan's and Alecia's performance in school had improved since the parties separated. This supports an award of joint physical custody, because it suggests the children will adjust to the new parenting arrangement. Although Kirsten attempts to characterize it otherwise, the evidence showed Mark took sincere interest and was involved in the children's lives, especially following his retirement from the military. He had leniency in his work schedule so he could meet his parenting demands, he prepared hot breakfasts, and he helped with homework, among other things.

There was evidence the parties sometimes had conflict; however, most of the incidents occurred during the pending divorce proceedings, when tensions were high. We cannot say the

- 8 -

confrontation in the driveway between Mark and Kirsten, the altercation between Kirsten and Nathan during which Mark allegedly stood by without intervening, or the incident when Mark and Nathan visited a college on short notice suggests the parties will not be able to exercise mutual authority and responsibility for the minor children under a joint legal and physical custody arrangement. Importantly, there was evidence of Mark and Kirsten's ability to communicate and cooperate. Mark testified he texted Kirsten whenever he saw Nolan was having "an issue" in school. He also testified that while Kirsten could not accompany him on the visit to the college, when the baseball coach offered Nathan a scholarship, Mark asked if he could hold the offer until Kirsten had an opportunity to visit, to which the coach agreed. Following the visit, he took 2 days off work to help prepare for the graduation party, which the record reflects both parties attended.

Based on both parties' demonstrated interest and involvement in their children's lives, the evidence of the minor children's ability to adapt to a joint physical custody arrangement, and the parties' ability to communicate and cooperate on child-related issues, even if their cooperation was interspersed with occasional divorce-related conflict, we conclude the court did not abuse its discretion in awarding joint physical custody.

(b) Final Decisionmaking Authority

Kirsten also argues she was denied due process, and that the court abused its discretion, when the court granted Mark "final say" in the event of an impasse on child-related decisions.

Although neither party acknowledges it, both Kirsten's proposed parenting plan and the plan approved by the court contain the following provision under the heading "Decision-Making":

[I]n the event that the parties cannot agree, after consultation with one another, and the Minor Children, if appropriate, upon an issue that requires immediate resolution, then in that event Father shall make such decision and, Mother and Father shall immediately arrange for mediation at the earliest possible time to resolve the underlying conflict which prevented the parties from reaching an agreement with respect to such decision.

Given that Kirsten's own proposed parenting plan gave Mark final say, we cannot agree she was denied due process or that the court abused its discretion in granting Mark such authority.

Even assuming the decisionmaking provision in Kirsten's proposed parenting plan was an overlooked drafting error, we cannot say Kirsten was denied due process or that the court abused its discretion. The Parenting Act requires every parenting plan to include "[p]rocedures for making decisions regarding the day-to-day care and control of the child consistent with the major decisions made by the person or persons who have legal custody and responsibility for parenting functions." § 43-2929(1)(b)(v). Accordingly, Kirsten knew this was an issue the district court would address in fashioning or approving a parenting plan. Furthermore, after Mark testified at length as to why he was requesting final decisionmaking authority, Kirsten declined to offer rebuttal testimony.

In addition, there was evidence supporting the court's decision. Mark testified that while Kirsten was "meticulous" and a "great mother," she lost her temper on occasion; while Mark admitted he lost his temper as well, he believed he was more "laid back" and could be more "level headed" if called upon to resolve an impasse on a child-related decision. Allison's testimony corroborated Mark's testimony regarding Kirsten's temper. While there was evidence of both

parties' parenting abilities, and of their occasional tempers, we cannot say the court abused its discretion in granting Mark final decisionmaking authority.

## 2. DIVISION OF PROPERTY

We next address Kirsten's contentions that the court abused its discretion in dividing the parties' marital residences and motor vehicles. When a court dissolves a marriage, Neb. Rev. Stat. § 42-365 (Reissue 2008) authorizes it to order an equitable division of property. This generally involves a three-step process: (1) classify the property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage; (2) value the marital assets and marital liabilities; and (3) calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015). The ultimate test for determining the appropriateness of the property division is fairness and reasonableness as determined by the facts of each case. *Id*.

### (a) Marital Residences

Kirsten maintains the court abused its discretion in its division of the parties' marital residences because the court failed to follow the three-step process outlined above. Specifically, she contends the court failed to take into consideration that her mother gifted her $20,000 to remodel the 26th Street home, which, according to Kirsten, should have been set aside as her nonmarital property. Kirsten does not specifically argue the court abused its discretion in ordering the marital residences sold; she simply contends the court should have followed the three-step process set out by the Nebraska Supreme Court.

Our review of the court's division of property is hampered to some degree because Kirsten has not included the court's findings in the record. Although the Nebraska Supreme Court has cautioned against file-stamping and filing a court's findings when the court communicates its findings to the parties prior to entering final judgment, *Wagner v. Wagner*, 275 Neb. 693, 749 N.W.2d 137 (2008), where, as here, the decree incorporates by reference the court's findings, those findings should be included in the record with the decree. Because that did not occur here, we do not know the basis for the court's division of property.

Even without the court's findings, however, we are able to review the record de novo and determine the court did not abuse its discretion. Kirsten focuses on the court's alleged failure to follow the three-step process for dividing property. However, determining values of certain marital assets and marital liabilities is not always necessary when the court orders the property sold. In such cases, the proceeds of the sale may be divided equally between the parties, or a specific amount may be first offset in favor of one party to recognize a nonmarital contribution or to otherwise equalize the marital estate or pay marital liabilities. Therefore, the court's determination of a property's value, and factoring such a value into its calculation of the net marital estate, is not necessary; the sale will determine the property's value and the allocation of proceeds can be ordered as needed to address nonmarital contributions and to maintain equalization of the marital estate.

We now address Kirsten's primary argument on this assigned error--her claim that $20,000 in nonmarital contributions to the 26th Street home should have been set aside to her. Even where

- 10 -

property is ordered sold and determinations of value are not necessary as discussed above, the court must nevertheless determine whether the property is marital or nonmarital. Given that the court ordered the real estate proceeds to be split equally and did not first set aside $20,000 to Kirsten, we can infer the court classified the $20,000 gift from Kirsten's mother as marital property. As we discuss next, the court did not abuse its discretion in so doing.

Kirsten's mother testified she wrote a check to Kirsten and Mark for $20,000 as a gift she hoped Kirsten would use to remodel the kitchen in the 26th Street home. She explained she wrote the check to both of them to avoid gift taxes. In *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004), the Nebraska Supreme Court addressed a similar situation. In *Gangwish*, a man's father gave a total of 14 shares of stock to the man and 14 shares to the man's wife; he gave the shares to the wife out of concern for tax consequences. The Supreme Court rejected the man's argument that all 28 shares were his nonmarital property. *Id*. Here, because Diane gifted the $20,000 to Kirsten and Mark jointly, the court properly treated the funds as marital property.

We further note that although Kirsten briefly mentions her request to be awarded the 26th Street home, she does not specifically argue the court abused its discretion in ordering both marital residences sold. We find no abuse of discretion in this aspect of the decree. This court has held that a court in a dissolution action may provide for the sale of all or part of the parties' assets in lieu of dividing them, if to do so is reasonable in light of the facts, the circumstances of the parties, and the nature of their property. *Kellner v. Kellner*, 8 Neb. App. 316, 593 N.W.2d 1 (1999). In so holding, this court cited dissolution cases from this court and the Nebraska Supreme Court involving court-ordered sales of property. *Id*. In *Walker v. Walker*, 193 Neb. 540, 227 N.W.2d 878 (1975), the trial court granted the husband a residence subject to a life estate in the wife, who despite being in poor health was given responsibility for managing and renting rooms in the home; the Supreme Court held the better course was to order the property sold and the proceeds divided equally. *Id*.

Our case is distinguishable from *Walker*, but we cannot say a court-ordered sale of the residences was unreasonable under the circumstances. Kirsten expressed no interest in being awarded the 38th Street home, and Mark had no objection to its being sold. Mark requested that the 26th Street home be sold; although Kirsten asked to be awarded the home, there was evidence she was unable to afford the expenses associated with it. Mark estimated the monthly expenses for the home, including mortgage and utilities, to be $2,290, and he believed the expenses would increase if Kirsten were required to refinance the mortgage.

Even assuming Kirsten could afford the home, the evidence of the home's value presented an additional challenge. Kirsten relied on the Sarpy County Assessor's valuation of $248,695, while Mark placed the home's value at $305,000 based on his "research and legwork," including contact with a realtor. Neither party presented an expert appraisal, which would have assisted the court in determining a value. If the court had accepted Mark's valuation and awarded the home to Kirsten, this would have likely eliminated Kirsten's receipt of any proceeds from the 38th Street home and may have still left her owing some marital equalization to Mark, all of which would have further impacted her financial stability. Under the circumstances, we find no abuse of discretion in the decision to order the residences sold and the proceeds split equally.

Kirsten also argues the district court failed to follow the three-step process when dividing the parties' motor vehicles. Kirsten claims she is entitled to an equalization payment of $7,000 based on her valuation of the vehicles. Kirsten was awarded the 2011 Honda Odyssey; Mark was awarded the 2013 Ford F-150 and the vehicles driven by the older two children: the 2002 Toyota (used by Allison) and the 2008 Ford Taurus (used by Nathan). Again, we do not know how the court reached its decision concerning the vehicles; nevertheless, in our de novo review of the record, we find no abuse of discretion.

Kirsten's argument on vehicle values arises from disagreements over the trade-in value of the 2005 Acura and the remaining debt owed on the 2011 Honda Odyssey. As to the 2005 Acura, it was not disputed that Mark traded in that vehicle to purchase his 2013 Ford F-150. Kirsten argues the evidence showed a trade-in value of $14,774; the Nebraska Sales/Use Tax and Tire Fee Statement generated by Mark's purchase of the 2013 Ford F-150 shows a "trade-in allowance" of $14,774. According to Mark, however, the $14,774 trade-in amount reflected on that document was arrived at from negotiations which included other discounts. He explained that the dealership "had a sale trying to get rid of their 2013s," and "4,500 was the Ford company's rebates, and the only other place to put the discounts was on the trade allowances." Mark testified the Acura's trade-in value was only $6,850, which was based on evidence received by the court of a used car website's valuation. Notably, when Kirsten was asked if she believed $14,774 to be the trade-in value for the Acura, she testified, "I was quite surprised, but, yeah, I guess." We cannot say the court abused its discretion in relying on Mark's explanation for the higher trade-in value noted on the sales tax document, along with Mark's evidence as to the Acura's actual trade-in value.

The other place of disagreement was the amount of remaining debt encumbering the 2011 Honda Odyssey, thus affecting its equity. Although Kirsten estimated the remaining debt to be $14,800, Mark testified the balance was approximately $9,900 at the time of trial, and he submitted documents supporting his testimony. Thus, even accepting Kirsten's testimony that the Honda was worth $21,900 (Mark testified the value was $25,000), the equity in the vehicle was at least $12,000, not $7,100 as she claims.

Finally, both parties agreed that the 1995 Ford F-150 was sold for $3,500 and those marital proceeds were used to purchase the 2008 Ford Taurus driven by Nathan. Kirsten only claimed a marital interest in the proceeds from the 1995 Ford F-150. As to the vehicle driven by Allison, Kirsten estimated the 2002 Toyota value at $3,350; Mark estimated it at $3,500. These vehicles were awarded to Mark, and using the highest values makes their combined value $7,000.

In sum, Kirsten was awarded the 2011 Honda with equity of at least $12,000. The combined value of the children's vehicles attributable to the marriage was $7,000. The trade-in value of the 2005 Acura was argued by Mark to be $6,850, and by Kirsten to be $14,774. Based upon evidence favoring Mark, for which we could find no abuse of discretion, the marital value of the vehicles awarded to him totaled $13,850. The difference between the values awarded to the parties is $1,850, which warrants an equalization of $925 from Mark to Kirsten. Thus, the award to Kirsten of the Templeton Fund, which the record reflects had a balance of $1,520.25 as of September 30, 2014, was an appropriate way to equalize the imbalance in vehicle values.

### 3. RESPONSIBILITY FOR CHILD EXPENSES

Kirsten next argues the court abused its discretion in its application of Neb. Rev. Stat. § 42-364.17 (Reissue 2008) when allocating extracurricular activity, education, and other extraordinary expenses. The court ordered the parties to bear equal responsibility for these expenses; Kirsten contends the court should have divided them 22 percent to her and 78 percent to Mark in accordance with their respective percentages under the child support guidelines (actually, line 6 of worksheet 1 attached to the decree lists Kirsten's share of the parties' combined net monthly income as 22.95 percent and Mark's as 77.05 percent).

Section 42-364.17 requires a decree of dissolution to "incorporate financial arrangements for each party's responsibility for reasonable and necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education, and other extraordinary expenses of the child." While the statute requires that each party's responsibility for such expenses must be included in the decree, it does not mandate how they are to be allocated. Also, Neb. Ct. R. § 4-212 of the Nebraska Child Support Guidelines requires a court calculating child support under a joint physical custody arrangement to allocate between the parties "all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities." Again, there is no mandatory language that such expenses be allocated based upon the percentages attributed to each party under the child support guidelines; however, it does provide a cap on the percentage of such costs that an obligor can be ordered to pay. Section 4-212 provides that such direct expenditures shall be allocated between the parents, but "shall not exceed the proportion of the obligor's parental contributions (worksheet 1, line 6)." Worksheet 1, line 6 represents each party's monthly net "percent contribution" of the parties' combined monthly net income. So since line 6 shows Kirsten's net monthly income to be 22.95 percent, and Mark's to be 77.05 percent, of their combined monthly net income, then as applied here, § 4-212 means that Mark, as obligor, cannot be ordered to pay more than 77.05 percent of the reasonable and necessary direct expenditures made solely for the children. Contrary to Kirsten's argument, there is no requirement by statute or rule that would require Mark to contribute 77.05 percent to such expenses. We find no abuse of discretion in the equal allocation of expenses ordered by the court.

### 4. ATTORNEY FEES

Kirsten's final argument is that the court abused its discretion in failing to award her attorney fees. In a dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013).

In this case, the district court divided the parties' assets equally. In addition, because the marital residences are to be sold, the parties will not have substantial debts. Although Mark's employment income greatly exceeds Kirsten's employment income, Kirsten was awarded alimony for 10 years and $1,644 monthly as her share of Mark's retirement pay. Kirsten's attorney's affidavit received into evidence on the last day of trial listed a total of $17,480 in attorney fees and $2,322.44 in costs. We cannot say the court abused its discretion in ordering each party to bear responsibility for his or her own attorney fees.

Likewise, we decline to award Mark the attorney fees he has requested on appeal pursuant to Neb. Ct. R. App. P. § 2-109(F). In addition to the factors set forth above, we note that although Kirsten was not successful with any of her assigned errors, she had to defend Mark's unsuccessful attempt to have this appeal dismissed based upon her receipt of benefits from the decree, largely premised upon her receipt of alimony and retirement benefits. Accordingly, each party should bear his or her own fees and costs on appeal.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Sarpy County.

AFFIRMED.