IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BLAUVELT V. SHANAHAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AIMEE SUSANNE BLAUVELT, APPELLEE AND CROSS-APPELLANT,

v.

COREY SCOTT SHANAHAN, APPELLANT AND CROSS-APPELLEE.

Filed November 13, 2018.    No. A-18-216.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

Timothy J. Buckley and Travis M. Jacott, of Adams & Sullivan, P.C., L.L.O., for appellant.

Bradley D. Holbrook and Elizabeth J. Chrisp, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Corey Scott Shanahan appeals from the order of the district court for Buffalo County, which awarded custody, parenting time, and child support regarding the parties' child. He assigns that the district court erred in awarding the child's mother, Aimee Susanne Blauvelt, sole legal and physical custody of their daughter and in limiting his parenting time based solely on the parties' inability to communicate. On cross-appeal, Aimee assigns the district court erred in calculating Corey's child support obligation based on his 2016 income, rather than his 2017 annualized income. For the reasons set forth below, we affirm the district court's order as modified with respect to the parenting plan, and we reverse the court's child support calculation and remand the cause to the district court with directions.

- 1 -

## II. BACKGROUND

### 1. COMPLAINT AND TEMPORARY PROCEEDINGS

Aimee and Corey dated from August to November 2014, during which time Aimee lived in Kearney and Corey lived in Kansas City. In February 2015, Aimee informed Corey that she was pregnant with his child. Aimee and Corey began dating again in April, and a few months later Corey moved to Kearney. Aimee gave birth to Copper, a daughter, in August of that year.

Aimee and Corey stopped dating in July 2016, and on July 28 Aimee filed a complaint to establish paternity, custody, visitation, and support. In her complaint, Aimee alleged that Copper has been in her custody from birth and asked the court to grant her temporary and permanent custody of Copper. On September 20, the district court entered a temporary order granting Aimee sole legal and physical custody, subject to Corey's parenting time, and ordering Corey to pay child support. The court calculated Corey's child support obligation based on Corey earning $5,000 per month.

On September 22, 2016, Corey filed an answer to Aimee's complaint, specifically denying that Aimee had custody of Copper from birth and that it would be in Copper's best interests to be in Aimee's care. The next day Corey filed a motion for reconsideration and to alter the court's temporary order. On November 1, the district court entered an order, modifying the September 20 temporary order to allow Corey to have parenting time on days that Aimee is working and he is not. The court also gave Corey parenting time whenever Aimee travels overnight for business purposes.

Corey thereafter filed a counterclaim, alleging that Copper lived with both parties until the court entered the September 20, 2016, temporary order. Corey asked the court to award him sole physical and legal custody, alleging that arrangement would be in Copper's best interests. In the alternative, Corey requested that the court award the parties joint legal and physical custody, alleging that arrangement would be in Copper's best interests. Aimee filed a reply to Corey's counterclaim, generally denying the allegations it contained.

On November 29, 2016, the district court entered an order clarifying its November 1 order. The court noted its November 1 order was motivated by this court's decision in *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016), which "reversed and remanded an experienced District Judge with directions to formulate a new parenting plan, taking into consideration the father's available parenting days." The court explained that under its November 1 order, Corey is "working" when he is primarily engaged in employment activities, which may occur at home. The court directed Aimee to text message Corey her work and travel schedule by 5 p.m. on Sunday and directed Corey to inform her by 7 p.m. if he wants parenting time during Aimee's work or travel.

### 2. TRIAL

Trial was held on November 13, 2017.

Aimee testified that she is an assistant buyer for a clothing company. She works from 8:30 a.m. to 5 p.m. Monday through Friday, and she never works holidays or weekends. Her work requires her to travel about once a month, sometimes more and sometimes less, to markets at various locations around the country. Her typical trip is 3 days and 2 nights long, but the trips are sometimes shorter and can be as brief as 1 day and 2 nights. In Aimee's suggested parenting plan, she provided that Corey would have the right of first refusal to watch Copper when she was absent from her residence for her employment for more than 72 hours. She admitted, however, that even her longest business trips do not last more than 72 hours and that under her proposed arrangement Corey would never be able to watch Copper. Aimee felt that having her parents watch Copper while she traveled was in Copper's best interests.

Other than briefly living with her parents between leases, Aimee has lived in her own apartment since she moved to Kearney. She and Corey never lived together. Aimee took care of Copper during her 9-week maternity leave while Corey was traveling and interviewing for jobs in Kearney. When Corey moved to Kearney, Aimee and Copper spent the night at his house a couple times each week. Aimee admitted that at some point during this time, she and Corey were spending roughly equal amounts of time with Copper. Aimee and Corey used Aimee's sister-in-law, Sarah Blauvelt, as their daycare provider. If Corey was home or leaving late for work, he would watch Copper instead of taking her to daycare.

Aimee did not believe giving Corey sole legal or sole physical custody of Copper would be best for Copper. Rather, she believed that Copper was in the "absolute best care" with Aimee having full legal and physical custody. She explained that under the temporary order, Corey would show up at Copper's daycare multiple times a day on several days each week to spend 2 to 4 hours with her. Aimee felt those visits disrupted Copper's routine. Corey did not tell Aimee when he planned to pick up Copper so that Aimee was unaware of Copper's whereabouts. When Aimee asked Corey to tell her if he planned to pick up Copper during the day, he refused. Corey would also take Copper to Omaha to visit his mother during his parenting time without telling Aimee. Aimee was concerned that those trips also disrupted Copper's routine. To Aimee's knowledge, Copper had fallen off a bed three times while at Corey's house, and she claimed one of those falls resulted in Copper breaking her wrist.

Aimee was also opposed to any joint custody arrangement. She testified that attempting to co-parent with Corey was the hardest problem she had ever faced. Corey threatened to "expose" Aimee to gain custody of Copper. She described Sunday afternoons as "horrific" because she and Corey would argue about how much time he could spend with Copper. Aimee and Corey do not speak with each other, which Aimee explained was due to Corey's temper. She did not feel that she and Corey could make joint legal decisions about Copper. Aimee indicated that the right of first refusal and the Sunday night communications provided in the temporary order were not workable and it would be best to have a specific parenting time plan in place. In her suggested parenting plan, Aimee proposed that Corey receive parenting time every other weekend from 6 p.m. Friday to 6 p.m. Sunday. She further proposed that Corey receive parenting time on Tuesday

each week from 5 p.m. to 7 p.m. Although Aimee had denied Corey extra parenting time in the past, she does not wish to keep Copper away from Corey.

### (b) Corey's Testimony

Corey has been a medical sales representative in some capacity for 8 years, although he changed jobs when he moved from Kansas City to Kearney. He currently sells artificial disks that are used in spinal operations. His position requires him to build relationships with surgeons in Omaha and Lincoln and to attend the surgeries they perform in order to answer questions about his product. Aside from the surgeries, which occur on average twice a week, he only has 15 to 20 minutes of administrative work to do from home every day. Corey could not provide documentation of what hours he worked, and he admitted that he does not have a set schedule.

Corey testified that he earned a base salary of $60,000. He also receives commissions and bonuses, which have steadily increased as his sales have increased. Corey's 2015 tax return showed that he had total income of $43,017 in 2015. Corey's 2016 tax return showed that he had total income of $154,614 in 2016. Corey's child support calculation showed gross income of $164,415.01 in 2016. Corey's pay stub for the payroll period of September 25 to October 8, 2017 showed that he had earned $203,150.90 to date in 2017.

Corey testified that he watched Copper most of the time when Aimee went back to work after her maternity leave. Aimee's complaint to establish paternity, custody, and child support surprised him, and the temporary order's limitations on his parenting time "devastated" him. He felt the temporary order ignored his sacrifice in moving from Kansas City to Kearney to be near his daughter.

Corey did not like the arrangement under the temporary order that required him to schedule his weekly parenting time with Aimee on Sundays, and he desired specified parenting time. He explained that most of their disagreements during the temporary period were due to Aimee limiting his parenting time and Aimee creating "fake chaos." Corey claimed Aimee was irrational, unstable, and dishonest. Regardless of their difficulties communicating during the temporary period, Corey still wanted to have Copper with him while Aimee was out-of-town for work. He explained that Aimee's denying him parenting time while she traveled for work was "heartbreaking" to him.

Corey testified that Aimee harassed and threatened him via text message, and ridiculed him in front of her friends and coworkers. Numerous text messages and recorded telephone conversations between the parties were received in evidence, some of which showed the parties had a rancorous relationship while others showed they got along. In several of the text messages Corey provided, Aimee complimented Corey as a good father and a good person. Aimee often praised his parenting while they were together. Corey explained that Copper fell off the bed at his house twice, one time "bending" her wrist bone without breaking it. Corey also explained the incident when Aimee claimed to observe Copper fall off the bed while facetiming; Copper was sitting on his lap, slid off, and hit her knee on his bedframe. During these incidents, Corey claimed to be in the room with Copper.

Corey testified about his care of Copper when she is with him and about the numerous activities that they engage in together. Corey provided photographs documenting the time he spent

with Copper. He felt that a joint custody arrangement would be beneficial for Copper and that his work schedule would allow for him to have significant parenting time.

Corey offered two suggested parenting plans. The first suggested that he receive sole legal and physical custody, but left Aimee's parenting time for the court's determination. The second suggested that he receive sole legal custody and that he and Aimee share joint physical custody. Corey proposed that the parties share equal parenting time, rotating weekly on Fridays at 8 a.m. On each parent's nonparenting week, he or she would receive additional parenting time on Wednesday nights at 6 p.m. The plan did not specify when Wednesday night parenting time would end.

### (c) Other Witnesses

Three of Aimee's friends and coworkers testified that they have observed Aimee to have a high quality relationship with Copper. The mother of one of Aimee's friends testified that she observed Copper fall off a bed during Corey's parenting time. Aimee's sister-in-law, Sarah Blauvelt, testified that she was Copper's daycare provider from shortly after Copper's birth until September 2017. She observed Corey to be a good father who would do anything for Copper. She admitted that she asked Corey to reduce the amount of time he spent at her daycare. Corey complied with her request.

### 3. COURT ORDERS

The district court entered an order on December 4, 2017 and a nearly identical amended order on December 7. The court noted that the temporary order's provision allowing Corey to have parenting time when he is not working resulted in considerable controversy between the parties. The court concluded that joint custody was unworkable and not in Copper's best interests because of the lack of communication between the parents. The court was concerned about Corey's attentiveness during his parenting time and felt he had understated the time that he works from home. The court awarded Aimee sole legal and physical custody due to her attitude and stability of character. The court awarded Corey parenting time every other weekend from 6 p.m. on Friday to 8:30 a.m. on Monday. Corey received parenting time from 5 p.m. to 7 p.m. on Tuesdays following weekends where he received parenting time. On Tuesdays following weekends where Corey does not have parenting time, the court awarded him parenting time from 5 p.m. Tuesday until 8:30 a.m. Wednesday. The court found that Copper should be with Corey, as opposed to Aimee's parents, during Aimee's business trips. As a result, the court gave Corey the right of first refusal to exercise parenting time whenever Aimee travels for work and is absent from her permanent residence for more than 48 hours, provided that Corey use Aimee's daycare provider. The court utilized Corey's income in 2016 of $164,415.01 in setting his child support obligation at $1,317 per month. The court did not rule upon Aimee's previously filed motion for attorney fees.

### 4. POSTTRIAL MOTIONS AND ORDER

On December 7, 2017, Aimee filed a motion for new trial or alternatively a motion to alter or amend, alleging that the court's use of Corey's 2016 income in calculating Corey's child support

obligation was contrary to law. Corey filed a motion for a new trial or in the alternative to alter or amend the final amended order on December 15. In the motion, he argued that there was insufficient evidence in the record to support granting Aimee legal and physical custody. Corey also filed an objection to Aimee's motion for attorney fees. The court heard arguments on the parties' motions at a January 29 hearing. Aimee argued that she should be entitled to an attorney fee because of the difficulty she had receiving information about Corey's income from him.

The court entered an order on the parties' motions on February 6, 2018. In denying Aimee's motion for a new trial or to alter or amend, the court explained that Corey's employment records showed considerable fluctuation in his income and that his income was on an upward trajectory. Because the court declined to speculate what his commissions and bonuses would be for the remaining months in 2017, the court used Corey's 2016 income in calculating child support. The court denied Corey's motion for a new trial or to alter or amend, quoting language from its amended order that described the parties' difficulty in arranging parenting time under the temporary order. Last, the court found Aimee's difficulties obtaining income information justified an award of a $2,500 attorney fee.

Corey appeals, and Aimee cross-appeals.

## III. ASSIGNMENTS OF ERROR

Corey assigns that the district court erred in (1) awarding sole legal and physical custody to Aimee and (2) finding the parenting plan to be in the best interests of Copper.

On cross-appeal, Aimee assigns, restated, that the district court erred in calculating Corey's child support obligation using his 2016 income rather than his 2017 annualized income.

## IV. STANDARD OF REVIEW

Child custody and child support determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See, *State on behalf of Fernando L. v. Rogelio L.*, 299 Neb. 329, 907 N.W.2d 920 (2018); *Kenner v. Battershaw*, 24 Neb. App. 58, 879 N.W.2d 409 (2016). A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Fales v. Fales*, 25 Neb. App. 868, 914 N.W.2d 478 (2018).

## V. ANALYSIS

### 1. Child Custody

Corey assigns that the district court abused its discretion in awarding Aimee sole legal and physical custody of Copper. He argues that because the court considered only the parties inability to communicate with one another, it failed to properly apply the factors listed in Neb. Rev. Stat.

§ 43-2923 (Reissue 2016). Upon our de novo review, we conclude that the district court properly weighed the best interests factors, and therefore, its sole custody award was not an abuse of discretion.

In determining the best interests of the child in a custody determination, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; and (4) credible evidence of abuse inflicted on any family or household member. Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014). See, also, § 43-2923.

The Nebraska Supreme Court has held that joint physical custody should be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017). See, also, *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017); *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

The district court found that both Aimee and Corey were fit parents, that both provided an appropriate environment, and that both have a close emotional relationship with Copper. The court found that while both Aimee and Corey are capable of parenting, "they are incapable of co-parenting." The court noted Corey's hostility toward Aimee, evidenced even during trial, but also found that Corey was sincere in his desire to maximize his time with Copper. The court found that Aimee and Corey cannot communicate with each other to any effective degree. The court concluded that joint legal and physical custody was unworkable and not in Copper's best interests due to the conflict between the parents and their lack of communication. Further, the court felt that Corey understated the amount of time that he worked and feared that he might be inattentive to Copper if he were given sole legal and physical custody. The court found Aimee to have an attitude and a stability of character that favored awarding her custody of Copper.

Contrary to Corey's argument, the parties' inability to communicate was not the sole factor in the court's custody decision. While the court did properly consider this factor, it also noted the level of discord between the parties, as well as Aimee's attitude and stability, in support of its determination that sole custody with Aimee, as opposed to joint custody, is in Copper's best interests. The record supports a conclusion that a joint custody arrangement as suggested by Corey would likely perpetuate turmoil as opposed to a stable atmosphere for Copper. See, *Erin W. v. Charissa W., supra*; *Donald v. Donald, supra*. Upon our de novo review, we conclude that the district court did not abuse its discretion in applying the best interests factors, and we conclude from them that the district court's award to Aimee of sole custody was not an abuse of discretion.

## 2. PARENTING TIME

Next, Corey assigns that the district court abused its discretion in finding the parenting plan was in Copper's best interests. As discussed below, we find the record generally supports the district court's parenting plan. We conclude, however, that the court's findings and the record warrant a minor modification regarding Corey's right of first refusal during Aimee's business trips.

The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness is to be made on a case-by-case basis. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id.* The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. See *Schriner v. Schriner*, 25 Neb. App. 165, 903 N.W.2d 691 (2017).

The district court largely based its parenting plan on Corey's inability to communicate with Aimee, which the court found would likely result in conflict that would not be in Copper's best interests. Corey argues that this court's decision in *Thompson v. Thompson, supra*, prevents a court from limiting parenting time based solely on the parent's inability to communicate. Although *Thompson* provides this proposition, we find the record here, unlike *Thompson*, contains factors in addition to the parties' inability to communicate that support the district court's parenting plan.

The father in *Thompson* was a firefighter who typically worked 24 hours on, 24 hours off until he had worked for 5 days, at which point he received 6 consecutive days off. As a result, the father requested the court give him parenting time on his days off instead of sending the child to daycare, which was the parties' arrangement during their marriage. The mother testified that she and the father were unable to communicate about "simple things" and that their communication had deteriorated further after they separated. The court determined that the parties equally co-parented their child until they separated, at which time the mother became the primary parent. The court awarded the father parenting time, without regard to his atypical work schedule, every other weekend from Friday at 6 p.m. to Sunday at 6 p.m. and two holidays each year. On appeal, we found that the record contained no justification for limiting the father's parenting time beside the parent's inability to communicate. We reversed and remanded, directing the court to formulate a new parenting plan that considered the father's available parenting days.

In this case, the district court awarded Corey more parenting time than the district court awarded the father in *Thompson*. The father in *Thompson* received parenting time with his child every other weekend, despite the fact that his work days may fall on the weekends. Under the district court's order here, however, Corey receives parenting time every other weekend, 2 hours on Tuesday nights following weekend parenting time, and overnight parenting time on Tuesdays following a weekend where he does not have parenting time. He also has the right of first refusal to exercise parenting time with Copper whenever Aimee's employment causes her to travel away from home, which we discuss in more detail below. Moreover, unlike the father in *Thompson*, who had an established work schedule that allowed him to exercise parenting time during the day about every other week, Corey did not have a "set schedule." Although Corey testified that he only does 15 to 20 minutes of work from home each day, the court felt that amount was understated. Without

a schedule demonstrating the hours Corey actually works, an arrangement that would allow Corey to watch Copper during the work day is not feasible.

Nevertheless, we find a minor modification to the district court's parenting plan is appropriate. The district court specifically found that Copper should be with Corey while Aimee travels for work. The court awarded Corey the right of first refusal to exercise parenting time with Copper when Aimee is away from her residence for her employment for more than 48 hours. Aimee testified that her travel for work often takes her away from her residence in Kearney for less than 48 hours. Considering the court's finding that Copper should be with Corey while Aimee travels for work, we find no reason in the record that Corey should not likewise be allowed the right of first refusal when Aimee is traveling for work for less than 48 hours. Thus, in line with our decision in *Thompson v. Thompson, supra*, we modify the parenting plan to give Corey the right of first refusal to exercise parenting time with Copper whenever Aimee's employment causes her to be absent from her current residence overnight.

### 3. CHILD SUPPORT

Aimee assigns on cross-appeal that the district court erred in calculating Corey's child support obligation using his 2016 income instead of his 2017 income. As discussed below, we find the district court's decision to use Corey's 2016 income in place of his estimated income for 2017 was an abuse of discretion.

The primary concern in determining child support is the best interests of the child. See *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017). The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective incomes. *Id.* In general, child support payments should be set according to the Nebraska Child Support Guidelines, which compute the presumptive share of each parent's child support obligation. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

Under Neb. Ct. R. § 4-204 (rev. 2015) of the Nebraska Child Support Guidelines, a court is to consider the total monthly income of both parties, which is defined as "income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages." The Nebraska Supreme Court has favored a flexible approach to determining a parent's income for child support proceedings because such actions are, despite the guidelines, equitable in nature. *Gangwish v. Gangwish, supra*.

### (a) Income Averaging

Aimee argues that by using Corey's 2016 income, the court essentially used his average income for the years 2015, 2016, and 2017. Citing *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002), she asserts that it would be inappropriate to use Corey's average income in this case because the record shows that Corey's income is steadily rising.

The mother in *Peter* filed a petition to modify a dissolution decree's child support provision. The father worked on commission as a stockbroker in the 3 years prior to trial, during which time his income steadily increased. The district court found that the steady increase showed

substantial fluctuations in the father's income, and as a result, the court used the father's average income to calculate the father's child support obligation. On appeal, the Nebraska Supreme Court found that it was not in the childrens' best interests to allow income averaging to determine a parent's income for child support purposes when that income was consistently increasing year after year. Instead the Nebraska Supreme Court found the trial court should have calculated the father's child support obligation using his current earnings income. *Id.*

Aimee's argument that the district court essentially used income-averaging in determining Corey's income is refuted by the record. In its order on the motions for new trial or to alter or amend, the court specifically found that income-averaging would be inappropriate. The court noted the considerable fluctuation in Corey's income; Corey's 2015 income was $43,017, his 2016 income was $164,415.01, and his 2017 income through October 8 was $203,150.90. In support of its decision to base child support only on Corey's 2016 income of $164,415.01, the court noted that this figure was higher than Corey's average income from the years 2015, 2016, and 2017, which it calculated to be $136,824.62. Further, the court observed that Corey's income was likely on an "upward trajectory," such that income-averaging would be inappropriate. This finding is consistent with *Peter v. Peter, supra*.

(b) Most Recent Income Information

Aimee argues that the district court erred in failing to use Corey's year-to-date 2017 income information as opposed to his 2016 income to calculate his child support obligation because Corey's income was steadily increasing. Records from Corey's employer showed that he had earned $203,150.90 as of October 8, 2017. Aimee asserts that the court should have extrapolated this information to arrive at an annual income for 2017. Aimee suggests that Corey's average monthly income for the first 9 months of 2017 was $22,572.32, and using that figure, Corey's estimated 2017 income would be $270,867.84. The district court rejected this suggestion, declining to "speculate" about the remaining 2 months of Corey's 2017 income.

The Nebraska Supreme Court has held that in determining child support, a court's findings regarding an individual's level of income should not be based on the inclusion of income that is entirely speculative in nature. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). In *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012), a child support modification case, the father's income fluctuated annually and was based partly on commissions. We concluded that the trial court erred in using an arbitrary 7-month timeframe (June 2010 through January 2011) in determining the father's income and we determined that the court should have used his most recent 2010 annual income figure.

Corey earns a base annual salary of $60,000, and the remainder of his earnings consist of commissions and bonuses. Corey's earnings through October 8, 2017, were not speculative; the record shows that he had already earned, in salary and commissions, the sum of $203,150.90. Further, Corey's testimony indicated that he would earn at least $5,000 per month in November and December 2017 in salary. While we agree that extrapolating any commissions and bonuses for the remainder of 2017 would have been speculative, it would not have been speculative to base Corey's child support on 2017 income of $213,150.90; $203,150.90 already earned plus $10,000 in remaining salary. Given the evidence that Corey's income is steadily increasing and recognizing

the primary concern in determining child support is the best interests of the child, we conclude that the court abused its discretion in using Corey's lower 2016 income in calculating child support.

After a de novo review of the record, we conclude that the district court abused its discretion in using Corey's 2016 income in its child support calculation. We therefore reverse this portion of the court's order and remand with directions to recalculate Corey's child support obligation using gross income of $213,150.90.

## VI. CONCLUSION

Upon our de novo review, we conclude that the district court did not abuse its discretion in its determination of custody and parenting time. However, we modify the provision regarding the right of first refusal to give Corey the right of first refusal when Aimee's employment causes her to be absent from her current residence overnight. We conclude the district court abused its discretion in calculating Corey's child support obligation using his 2016 income. We reverse that portion of the order and remand the cause with directions to calculate Corey's child support obligation using his gross income of $213,150.90.

AFFIRMED IN PART AS MODIFIED, AND IN PART
REVERSED AND REMANDED WITH DIRECTIONS.